Testator by his will created trusts for his two children, and appointed H. and W. trustees. The trustees accounted as executors in 1890, when they took over the trust funds, and in 1892 and 1898. The latter had been the attorney of testator, and had charge of his estate before his death, and the children gave him power of attorney to indorse checks and receive all trust income, which he did until his death. At the time of the account in 1892 W., who had held possession of the securities of testator during his lifetime and during the continuance of the trust estate, gave H. a key to the safe deposit vault in which he kept the securities, and H. examined them, and in 1898 H. went to the vault with W., who showed him the securities. H. never examined the securities again until W.'s death in 1903, when he found that W. had surrendered the original box, and that only a few of the securities remained in another box hired by W. individually. A large part of the trust funds consisted of unregistered railroad and municipal bonds, and notes secured by trust deeds on farm lands in other states, taken in the name of local agents, who indorsed them in blank; and the evidence further showed purchases by H. of railroad bonds for investments and delivery of the same to W. for deposit. H. kept the income account. W. sent to H., who lived in Brooklyn, the income every month, which H. deposited to the credit of the trustees and drew checks payable to the beneficiaries, which he returned to W., which W., after signing under his power of attorney, deposited in his individual account and paid the beneficiaries, until two weeks before his death. *Held* insufficient to show negligence on the part of H. in permitting the securities to remain negotiable as at the death of the testator, or in purchasing others without requiring them to be registered in the names of the trustees jointly.

2. SAME.

The fact that H. turned over to W., who had the actual custody of the fund, unregistered railroad bonds purchased by H. in New York and given to W. in Poughkeepsie, to be kept in the safe deposit vault there in the ordinary course of business, was not negligence.

3. SAME.

The failure of H. to examine the safe deposit box between 1898 and 1903 was not negligence; there having been an agreement for settlement of accounts every five years, and neither the beneficiaries nor H. having any knowledge or suspicion of wrongful acts on the part of W.

In the matter of the judicial settlement of John F. Halstead, surviving trustee of the will of Charles J. Buckingham. Trustee discharged.

Frank B. Lown and Allison Butts, for trustee.
Charles F. Cossum and George C. Kobbé, for beneficiaries.

HOYSRADT, S. Charles J. Buckingham, who died in 1889, nominated in his will Robert F. Wilkinson and John F. Halstead as executors and trustees. Both qualified at the probate of the will, accounted as executors in 1890, and took over as trustees two funds created for the benefit of Charles H. Buckingham and Martha W. B. Wood, children of the testator. It appears that the securities of which these two funds were composed, or a greater portion of them, came to the testator under the will of his brother, Stephen M. Buckingham, who died in 1887. Robert F. Wilkinson then, and

until his death on June 29, 1903, an eminent lawyer, who was implicitly trusted by his clients and associates, had been attorney for Stephen M. Buckingham and his executors, who administered upon an estate of over $700,000, and he was also the attorney for Charles J. Buckingham in his lifetime and had the custody of his securities, acting in the nominal capacity of trustee for him in the care and management of his property and affairs. It does not appear that there was any actual change in this relation after the death of Charles J. Buckingham, or in the custody of the property, down to the time of the trustee's accounting in 1892, or, in fact, to the subsequent accounting in 1898, and, in ratification of the confidence reposed in Wilkinson by the testator, the beneficiaries under the will gave him power of attorney to indorse checks for them and to receive all income accruing from the trust funds, and under this authority he received their income, deposited it with his private funds, and sent them his individual checks. From the surplus income due to Charles H. Buckingham, one of the beneficiaries, Wilkinson made reinvestments. The confidential relations between Wilkinson and the beneficiaries were of the closest nature, and, so far as the evidence indicates, were without dissension to the time of his death.

The two trustees, Halstead and Wilkinson, had agreed to render an accounting every five years, and accordingly in 1898 proceedings were had in this court for the third accounting, in which a decree was entered charging the trustees with $67,658.16, the capital of the fund then shown to be held by them for the benefit of Charles H. Buckingham, and with $61,946.39, the capital of the fund then shown to be held by them for the benefit of Martha W. B. Wood. Halstead, the surviving trustee, says that at the time of this accounting he went to the Farmers & Manufacturers' National Bank of Poughkeepsie, where Wilkinson, after going into the safe deposit vault, brought to him the securities which represented these funds. Halstead then personally examined them, and found them to correspond with the detailed enumeration in the account. After this inspection the securities were returned to the two tin boxes in which they had been previously kept, and they were locked in the safe deposit vault. It appears that at or about the time of the accounting in 1892 Wilkinson hired a box in the safe deposit vault and delivered a key to Halstead, which would enable him to examine the contents of the box in the absence of Wilkinson. Halstead did not make such an examination before the accounting of 1898, when he found the securities called for by the account, and he made no further examination until after Wilkinson's death. It is evident that Halstead acted upon the assumption that, under the circumstances, it was not incumbent upon him to examine the securities within the period intervening the accountings. At the time of the last accounting in 1898, referred to, the securities, composing both trust funds, consisted of $34,972.29 in railroad and municipal bonds and $60,630 in notes secured by trust deeds of Illinois farm lands. The trustees credited themselves with an aggregate of $32,650, representing the cost value of Kansas City real

estate acquired through the foreclosure of mortgages, coming prin-
cipally from the testator. The bonds referred to were unregistered.
The trust deeds and notes were taken in the name of the local
agents, who assigned or indorsed them in blank, and they remained
in that condition while in the hands of the trustees.

Halstead does not claim to have been a passive trustee. It has
been shown that at regular intervals, to the month in which he died,
Wilkinson remitted what purported to be the income to Halstead,
who deposited it to the joint credit of the executors in the Mer-
cantile National Bank of New York, and then drew checks upon
this account payable to the beneficiaries. These checks were re-
turned to Wilkinson for his signature. It seems to have been Wil-
kinson's custom, after signing these checks, to indorse the name of
the beneficiary under authority of his power of attorney, and de-
posit them in his individual account, from which he paid the ben-
eficiaries with punctuality until he left for Europe two weeks be-
fore his death. Halstead also kept the income account, while Wil-
kinson kept the capital account, entering with great minuteness
each security in a ledger on a page by itself. Mr. Halstead also
purchased some of the railroad bonds and delivered them to Wil-
kinson for deposit with the other securities, and was consulted by
Wilkinson as to the Illinois investments made by the trustees. So
it appears Halstead performed his share of the duties usually de-
volving upon two active trustees, leaving that portion of the work
to Wilkinson for which he was better qualified. Frequent corre-
spondence, statements, and accounts passed between the trustees,
and their relations appear to have been attended with the utmost
confidence and harmony. I recall no evidence in this case showing
any transaction or communication between the beneficiaries and
Halstead, and, while it may not affect the material question in-
volved, there is abundant evidence that they looked to Wilkinson
for the administration and management of their affairs. Their
powers of attorney completed practically all the trust they could
have placed in him, and there seems to have been not the slightest
indication, prior to his death, that this trust had been misplaced.
It has not been shown that the beneficiaries ever knew that the
custody of the securities had been surrendered by Wilkinson, or
that they knew that Halstead had access to them after 1898.

Mr. Wilkinson died June 29, 1903, and Mr. Halstead subsequently
discovered that the safe deposit box had been surrendered by his co-
trustee, at what date does not appear, and that what remained of the
securities were in another box, hired by Wilkinson individually. Fur-
ther examination disclosed there was but a remnant left of the securi-
ties, representing a value of $5,500, which indisputably belonged to
the Buckingham estate. The amount of Wilkinson's misappropriation
and indebtedness to this trust estate has been determined in other pro-
ceedings in this court at $120,710.04. The beneficiaries now seek to
charge Mr. Halstead with responsibility for his co-trustee's acts on
general and specific charges of negligence which may be properly sum-
marized as: Failure to require all the securities to be payable to or
registered in the names of the trustees jointly, surrendering the fund

and the securities he purchased to Wilkinson, and omission to examine the securities after the last accounting.

It has been urged that the surviving trustee was negligent in permitting the securities to remain of the same negotiable character as they were at the death of the testator, and in purchasing other securities without requiring that they be made payable to or registered in the names of the trustees jointly. The beneficiaries have failed to show any circumstance which tended to arouse the suspicion of the surviving trustee or themselves, or that there was the slightest reason to believe that the safety of the fund was endangered. No American authority has been cited to sustain this contention, and, in view of the situation outlined in this case, it was not, in my judgment, negligent for Halstead to permit the continuance of the methods which the testator had established and assented to. Wilkinson resided in Poughkeepsie, while Halstead lived in Brooklyn, and, owing to the circumstances referred to and the situation of the trustees, it would have been expensive and unusually cumbersome if the fund was so controlled that every detail of the administration required the joint action of the trustees.

The beneficiaries urged that Halstead was negligent in permitting the transaction whereby the securities became accessible to each trustee. It will be borne in mind that Wilkinson had sole custody of the fund prior to this transaction, and that it, in effect, was Wilkinson's act giving Halstead access to the securities. There had been no actual joint possession of the fund, and Halstead's consent to this arrangement, in view of the circumstances, should not be considered negligent. The turning over to Wilkinson of the unregistered bonds purchased by Halstead presents the question of just what delivery of assets by a trustee to his co-trustees renders the former liable. It has been frequently held, and the rule is now well established, that where a trustee unnecessarily surrenders the joint custody of funds to the sole custody of his co-trustees he becomes liable for the application of the funds by his co-trustees. Purdy v. Lynch, 145 N. Y. 462, 40 N. E. 232; Nanz v. Oakley, 120 N. Y. 84, 24 N. E. 306, 9 L. R. A. 223; Bruen v. Gillet, 115 N. Y. 10, 21 N. E. 676, 4 L. R. A. 529, 12 Am. St. Rep. 764; Paulding v. Sharkey, 88 N. Y. 432; Matter of Provost, 87 App. Div. 90, 84 N. Y. Supp. 29.

In the case at bar it appears that Halstead delivered the bonds to Wilkinson in New York to take to Poughkeepsie for deposit with the other securities, or, in other instances, directed the broker through whom the bonds were purchased to deliver them to Wilkinson for the like purpose. This was the usual and ordinary transaction, and the delivery was made in entire good faith and comes within the definition of the word "necessary" in Purdy v. Lynch, supra. The joint possession of the bonds prior to their delivery is not established, and should not be implied, to charge Halstead with personal neglect. In Davis v. Kerr, 3 App. Div. 322, 38 N. Y. Supp. 387, and Glacius v. Fogel, 88 N. Y. 434, where there seems to have been no proof as to the actual custody of the fund, the courts have held that joint custody could be implied from the rendering of a joint account; but the proof in the case at bar is that, prior to the delivery of the key to Halstead, Wilkinson had actual custody of the entire fund. The Court of Appeals in

Purdy v. Lynch, 145 N. Y. 462, 40 N. E. 232, discountenances the employment of legal fiction or conclusions for the purpose of holding a trustee for negligence. The circumstances referred to, when considered with the rules applied in the most recent cases, fail to establish the absence of prudence and ordinary care in these transactions. It was within the usual course of business to accomplish the purpose of keeping the fund together in the safe deposit, and was carried out in good faith by Halstead.

Another charge of negligence is based upon the fact that Halstead joined in the execution of several assignments of mortgages, and permitted Wilkinson to subsequently retain the proceeds of those mortgages. It does appear that Halstead's execution of the assignments was necessary in the ordinary course of business, and that his act was within the rule laid down in Purdy v. Lynch, supra, but not originating there. In Paulding v. Sharkey, 88 N. Y. 434, and in Croft v. Williams, Id. 384, the Court of Appeals reached the conclusion that, where the joint act is necessary and only formal, it is insufficient of itself to impose liability upon a trustee, acting in good faith, for the dishonesty of his co-trustee. In Paulding v. Sharkey three executors joined in a deed of real estate, and the proceeds were received by one of their number in a check payable to him individually. He indorsed it and delivered it to one of his coexecutors, who received the money. The court held that the other executors were not liable for his default. This certainly presents a stronger case than the formal execution of an assignment of mortgage by Halstead, when the proceeds never came within his control. See, also, Matter of Johnson, 42 Misc. Rep. 651, 89 N. Y. Supp. 733.

The question of Halstead's liability for his omission to examine the safe deposit box subsequent to the last accounting must be carefully considered within the principles laid down in the latest decisions in this state, which have in a slight degree modified the rigidity of earlier decisions and those in English cases. Much emphasis has been laid by the counsel for the beneficiaries upon Halstead's failure to act, when he might have prevented Wilkinson's defalcation, and upon the alleged results of such omission. But a proper consideration of the question requires an elimination of all conjectures as to what might have been avoided. The question to be determined is:

"Did Halstead, in view of the circumstances existing at that time, employ such prudence and diligence in the discharge of his duties as, in general, men of average prudence and discretion would, under like circumstances, employ in their own affairs?"

In determining the answer to that question, we are to look at the situation as it existed at the time when it is alleged that the trustee was negligent, not aided by subsequent events or disclosures. The surviving trustee's confidence in Wilkinson could not have been more fully justified from existing circumstances. Halstead had no knowledge of the misappropriation of the securities, and there is not an atom of evidence that anything was brought to his attention which would excite the suspicion of a man of average prudence and vigilance, or that he overlooked any suspicious fea-

ture of Wilkinson's conduct or mode of living. His liability, if any, rests solely upon his failure, under those circumstances, to examine the safe deposit box to which he had access in the period intervening between the accounting of 1898 and the intended accounting of 1903, bearing in mind Wilkinson's domination over the fund during the testator's lifetime and until the accounting of 1898, when Halstead's investigation showed the funds to be intact, as they had been on two previous accountings.

In Wilmerding v. McKesson, 103 N. Y. 329, 8 N. E. 665, one of the leading cases, it appears that the trustee charged with liability had knowledge of the misapplication of the fund. He claimed to have had no knowledge, but it was shown that his co-trustee's firm was paying interest upon the fund misapplied. The finding of neglect was based upon his knowledge of the devastavit. The Court of Appeals (at page 338, 103 N. Y., page 668, 8 N. E.) says:

"Cases may arise where one executor is responsible for the acts of his coexecutor in the management of funds which have come into his hands; but where the funds of the estate were lawfully received by one of the executors, or were originally in his hands, or properly paid to him in the due course of administration, and there is nothing to excite suspicion as to the integrity or responsibility of such trustee, or to create a belief that the funds have been improperly used or invested in violation of the established rules applicable to such cases, or were unlawfully allowed to remain uninvested, there is no rule which charges the executor or trustee who has not control of the fund with the wrongful acts or misconduct of his associate."

The court held that McKesson, an active trustee, while liable for permitting the funds to be loaned to the firm, because negligent, was not liable for the wrongful conversion of the securities of the estate by Wilmerding without his knowledge or consent; and it was held that this loss, caused by the wrongful conversion by Wilmerding without his knowledge and with nothing to excite his suspicion that his co-trustee would be guilty of the misapplication of the funds of the estate, did not make him responsible. He was not chargeable as to this portion of the fund "with culpable negligence, and none of the decisions sustain the rule under the facts presented that he should be held to the most strict and rigid accountability." This decision has a very important bearing upon the case at bar, and particularly as the Court of Appeals holds that, while McKesson knew for a long period of the misapplication of a portion of the fund, he was not liable for his failure to protect the remainder of the fund, which was dishonestly taken.

The rule laid down in Williams on Executors is:

"A devastavit by one of two executors shall not charge his companion, provided he has not intentionally or otherwise contributed to it; for the testator having misplaced his confidence in one shall not operate to the prejudice of the other."

A coexecutor is not liable unless it appears that he had knowledge or assented to the acts done, or had notice which should excite his suspicion and put him on inquiry. A wrong done or a duty omitted must lie at the foundation of his liability. Sherman v. Parish, 53 N. Y. 483; Adair v. Brimmer, 74 N. Y. 539; Ormiston v. Olcott, 84 N. Y. 339; McCabe v. Fowler, Id. 314; Croft v. Williams, 88 N. Y. 389. Many other cases reiterate this rule.

In Matter of Hoagland, 79 App. Div. 56, 79 N. Y. Supp. 1080, Justice Woodward writing the decision of the Appellate Division of this Department, applies the test, as to the exercise of ordinary care and prudence, as "whether the conduct of the executor has been guided by good faith, reasonable judgment, and an intention to fairly and fully discharge his duty." In my judgment Mr. Halstead's administration measures up to this standard, and that all the elements of liability, i. e., knowledge of the wrongful acts or assent to them, notice which should have aroused his suspicion, a wrong done, or a duty omitted by him, are not established in this case. Mr. Halstead does not come within the rule of liability laid down in cases where property held jointly has been transferred to the sole control of one trustee.

The only element which would suggest a joint holding in this case is the rendering of a joint account, and this, for the reasons previously stated, should not overcome the positive proof that the holding was not joint. The holding of the securities after the hiring of the safe deposit box certainly was not joint, as it required no act of Halstead for Wilkinson to reach the fund. These views lead to the conclusion that Halstead is not liable for the default of his co-trustee.

Decreed accordingly.