In the Matter of DAVID T. GOLDSTICK et al., as Trustees of the Trusts for the Benefit of MINNIE L. TANANBAUM., Appellants-Respondents. MINNIE L. TANANBAUM et al., Respondents-Appellants. (And Two Other Related Proceedings.)

First Department, February 27, 1992

228

## APPEARANCES OF COUNSEL

*Samuel J. Silverman* of counsel *(David N. Ellenhorn* and *James Robert Pigott, Jr.,* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison* and *Stein, Zauderer, Ellenhorn, Frischer & Sharp,* attorneys), for Florence Levine, appellant-respondent.

*Philip Pierce* of counsel *(Jerome R. Halperin, Alice Slater, Robert W. Dremluk* and *Bruce S. Klein* with him on the brief; *Philip Pierce Eaton & Van Winkle* and *Jerome R. Halperin,* attorneys), for David T. Goldstick, appellant-respondent.

*Stuart A. Summit* of counsel *(John L. Amabile, Thomas A. Holman, Louis Wollin, Neil I. Jacobs, Emily J. Weissman* and *Ronald E. Stringer* with him on the brief; *Summit Solomon & Feldesman* and *Lefrak Newman & Myerson,* attorneys), for respondents-appellants.

*Bernard B. Cohen,* guardian ad litem, for infant remainder-men.

## OPINION OF THE COURT

Wallach, J.

This proceeding was begun in 1989 with the filing of three petitions for final accountings and related relief by David T. Goldstick and Florence Levine, as cotrustees of a testamentary and certain inter vivos trusts established for the benefit of Minnie Tananbaum (Tananbaum) by her father, Martin Tananbaum, a multimillionaire with interests in taxicab fleets, horse breeding, and Yonkers Raceway, who died in 1970. Although no formal petition was ever filed with respect to the similar trusts set up for Minnie's sister, Barbara DeGorge, the Surrogate proceeded to an accounting of these based on the annual reports furnished to Barbara by the trustees for the years 1971-1982, with a few gaps. Early in the trial, over strenuous objection, the Surrogate (hereinafter the court) determined to reopen Martin Tananbaum's estate, which had been administered from 1970 to 1976 by Levine (the testator's sister) and Goldstick (his nephew), who were the named executors.

Tananbaum and DeGorge filed objections to the "accounts," and the trial of the issues as they proliferated consumed about 125 days and generated a 13,000-page transcript. At the conclusion the court imposed surcharges of $8.7 million in favor of the two objectants against the two trustees, and removed the latter from office. They appeal. Finding numerous errors of law and fact, we reverse many of these surcharges as unwarranted, and remand other issues for a further hearing with limiting instructions.[1] An exposition of these errors follows.

(1) *The executorial estate surcharge—($210,000, plus approximately $280,000 in interest).* Although the proceeding began as an accounting of the Tananbaum (and later the DeGorge) trusts, the court reopened the Martin Tananbaum estate which had been closed by releases executed by both objectants 13 years earlier. The basis for this surcharge was that the legal fees paid to Goldstick's former law firm were excessive in themselves, and improper as including plainly executorial services. (The Martin Tananbaum will provided that his sister would be entitled to executor's commissions at half the statutory rate; Goldstick was to serve without this compensation.)

■ (a) *The 1977 releases* executed by objectants effectively barred them from challenging the executors' administration of the Martin Tananbaum estate and imposing surcharges based thereon. In treating the releases as a nullity, the court concluded that when the releases were signed "it was impossible for the full facts of the handling of the estate, such as the non-legal services rendered by Goldstick for which he charged legal fees and items charged to the estate, having nothing to do with the estate, to have come to light." The actual facts, as disclosed by the record, are entirely to the contrary. When Goldstick presented the executors' final account to the objectants in December 1976, he urged that they retain independent counsel. Both Tananbaum and DeGorge followed this advice, and were separately represented by attorneys with experience and standing in estate and tax matters. These lawyers pursued diligent inquiries with Goldstick, who provided detailed time records of the services provided, including a written disclosure that his fees (improperly, to be sure)

---

1. Although appellants urge reversal on grounds of judicial misconduct, bias and the denial of a fair trial based, *inter alia,* on surprise and so-called "impounding" of exhibits, we reject those contentions, and our disposition of this appeal does not rest on any of those grounds.

"took in consideration that I served as an Executor without compensation."

The $233,000 legal fee of Goldstick's law firm, acknowledged and ratified by the releases, was apparently regarded by the court as unconscionable, inasmuch as it reduced the amount by $190,000, and the executors were surcharged accordingly. That drastic action will not withstand scrutiny. The executors' account as of June 30, 1976 showed that the estate's assets had increased from a $6,317,911 valuation at decedent's death to over $8 million. The legal fee as approved by the objectants constituted slightly less than 3% of the gross estate, and thus is facially reasonable (cf., Matter of Kennedy, 56 Misc 2d 1092, where a fee equal to approximately 4% of the gross estate was held presumptively reasonable).

In upending the releases, the court relied upon Matter of Birnbaum v Birnbaum (117 AD2d 409, 414), where the proponent of the release had "guided [the] hand" of the signatory family member who could neither read nor write English, and the other three signers acted without independent advice. Birnbaum, to say the least, is entirely distinguishable from the facts at bar. Here there was complete disclosure coupled with expert advice and guidance. To reject these releases under the circumstances shown here would go a long way toward rendering the device unavailing except in the most trivial situations, and would set at naught the long-standing policy of the law approving this expense-saving device in lieu of recourse to judicial intervention for finality in the settlement of fiduciary accounts (Matter of Blodgett, 171 Misc 596).

(b) The infant remaindermen are effectively bound by the releases under the principle, codified since 1967 in SCPA 315, of virtual representation. At the time the objectants executed the releases, each was the mother of an infant. Their interests, and those of DeGorge's subsequent issue, are represented by a duly appointed guardian ad litem who objects to the application of the doctrine against the potential claims of his wards. While it is true that virtual representation is to be applied with caution (Matter of Lawrence, 106 Misc 2d 19, 21), here the conditions for recourse to the doctrine are fully satisfied.

In 1981 the Legislature added subdivision (8) to SCPA 315, providing that virtual representation shall apply to nonjudicial settlements of accounts of fiduciaries "[u]nless the instru-

ment expressly provides otherwise".[2] No such limiting provision is to be found in the Tananbaum will.

DeGorge's issue were virtually represented by her since she was the remainderman of her own two trusts in 1977, having at that time the status of an income beneficiary with the principal to revert to her at age 49. Also pertinent is the fact that Tananbaum was a contingent beneficiary of the DeGorge trusts. Further, the interests of each objectant and her children, during the administration of the estate, were identical in pursuing a maximum funding of the testamentary trusts; no conflict of interest between parent and child in this fundamental objective can be discerned. Therefore, virtual representation should be invoked *(Matter of Connable,* 102 Misc 2d 406; *Matter of Adler,* 77 Misc 2d 651). Interestingly, the court applied the virtual representation doctrine here in the course of rejecting an unrelated claim by the objectants that a judicially approved sale of a large estate asset (White Devon Farm) was imprudent.

■ (c) *Statute of Limitations.* It is also clear that at least with respect to Levine, the six-year Statute of Limitations (CPLR 213 [1]) commenced to run in 1976 when the executors repudiated any further obligations to the Tananbaum estate *(see, Matter of Barabash,* 31 NY2d 76) by presenting their final accounts to, and obtaining releases from, the objectants *(see, Matter of Mathewson,* 264 App Div 939). It is disingenuous on the part of objectants to argue that Levine may have waived the statute by failing to plead it, inasmuch as they raised the executorial issues only at trial, seven years after the running of the statute, and Levine then promptly responded by raising the issue in a pertinent brief.

For reasons which the record fails to divulge, there is no showing that Goldstick ever joined in Levine's memorandum or otherwise invoked the statute at the trial level. The availability of the statutory bar as a defense for him, now raised for the first time on appeal (by citation to CPLR 213 [8], pertinent only to fraud, as to which the court made no findings), is problematical at best.

■ (d) *Other executorial surcharges.* With validation of the releases, it follows that three other surcharges imposed by the court, connected with the administration of the estate, are foreclosed:

---

2. The legislation applied to all estates and trusts in being at the time of the enactment (L 1981, ch 178, § 3).

(i) the sum of $14,042 paid out by the executors in satisfaction of a political pledge allegedly made by decedent during his lifetime;

(ii) the sum of $5,000 paid to Goldstick's mother for services allegedly rendered by her in connection with the sale of decedent's home; and

(iii) the executor's commissions paid to Levine *(see,* discussion under point [3] [b] [ii], *infra).*

We now must review the surcharges related to the trustees' actions (and, in the case of Levine, inaction) in the administration of the objectants' trusts.

(2) *Surcharges for losses on investment securities ($1.4 million plus $1.6 million in interest), and for fees paid to investment advisers ($200,000 plus $21,000 in interest).*

■ (a) *Losses.* The decision of the court on this phase of the case properly identified as imprudent a $25,000 investment of the assets of Tananbaum's 1967 trust in a start-up company called Sarmi which had no earnings history—an outlay which was also tainted with improper self-dealing, since the principal of that company was a client of Goldstick's law firm. This surcharge, now payable to Tananbaum as an income distribution, with interest, should stand.

However, the balance of these surcharges, imposed indiscriminately upon all losses sustained in securities trading without regard to gains or possible tax advantages, cannot be sustained on the theory, adopted by the court, that the trustees abdicated all control of investment decisions to the three retained brokerage firms. The court cited no authority for the proposition that employment of an investment adviser with full discretionary authority to buy and sell is per se improper, and yet, without explicitly adopting such a rule, the court reached such a result. With respect to a finding of imprudent conduct by the trustees, and without further specificity, the court concluded: "The record further indicates that the trusts purchased various bonds that were not rated at all or badly rated by major services such as Standard & Poor's or Moody's. Various stocks of companies not listed on major indexes were added to the trusts' portfolios. Moreover, despite certain cost and risk factors, the fiduciaries permitted the use of a margin account so that options could be sold. According to the testimony of one expert, each of these activities would be unsuitable for a fiduciary as they involved certain risks and costs and would therefore be imprudent."

Yet the appendix computing these surcharges reveals that the court did not adhere to its own announced standard. That exhibit discloses that surcharges were imposed with respect to investments in the stocks of a number of companies that *were* listed on the Standard & Poor's and Dow Jones Industrials indices. Among these companies are Upjohn, Burlington Industries, Ford Motor, Polaroid and Xerox. The court's reference to "badly rated" bonds was not explained. One of the trustees' investment advisers testified that during his tenure all bonds acquired, with the exception of certain convertible issues, were Standard & Poor's "A or higher rated", i.e., investment grade. A trustee's investment in bonds rated "BB" or even "B" does not, of itself, constitute imprudence, or a departure from the statutory standard of prudence *(Matter of Morgan Guar. Trust Co.,* 89 Misc 2d 1088; *see,* EPTL 11-2.2 [a] [1]).

Given the gaps in the record, which are not satisfactorily addressed, we vacate the balance of this surcharge and remand it for further development of any specific claims of imprudence if the objectants be so advised.

■ (b) *The investment advisers' fees.* As the court itself noted, "The trustees' lack of market experience would also suggest a propriety in their seeking professional assistance in managing significant funds *(Matter of Axe,* 132 Misc 2d 137)." The will and the trusts explicitly authorized the retention of investment advisers. There is no basis for this surcharge, and we vacate it.

(3) *Surcharge on all profits from commingled real estate investments, and Levine's forfeiture of commissions.*

■ (a) *The commingled investment (surcharge of $2.6 million, plus interest of approximately $1.4 million).* Goldstick met with greater success in the real estate market. He invested some $181,125 of trust funds in various real estate partnerships in which he already had a substantial interest. These enterprises yielded Goldstick, his coventurer wife and his corporate alter egos a handsome profit of more than $2½ million. Approximately 14% of the capitalization of those partnerships came from the Tananbaum and DeGorge trust funds. The court concluded that these huge profits were realized in part from "self-interested dealing" on the part of the trustees. Even though the trust beneficiaries profited from these investments to the extent of $158,544.32, the court, somewhat exercised over Goldstick's receipt of $2,599,292 in

profits and fees from the same investment, surcharged the trustees in the full amount of those receipts. This was error.

The first duty of a trustee is that of loyalty to the beneficiaries of his trust (IIA Scott, Trusts § 170), and he may not jeopardize that duty for his own personal benefit *(id.,* § 170.25). The trustee has a duty to segregate trust property, and should not mingle trust funds with his own (Restatement [Second] of Trusts § 179, comment *b).* Commingling trust funds with a trustee's own funds has been held a breach of trust, although such a rule is more a matter of policy than one of law *(see, Matter of Lincoln Rochester Trust Co.,* 201 Misc 1008, 1013). There are circumstances when commingling of the assets of several trusts may be advantageous and thus permissible, such as in consolidating and thus reducing administrative costs. However, in those situations it is incumbent upon the trustee to earmark the funds so they can be traced. A trustee is, of course, liable for dissipating commingled funds through imprudent investment. On the other hand, he is not subject to a surcharge for a breach of trust that results in no loss (III Scott, Trusts § 205).

If a trustee commits a breach of trust that results in a personal gain, he is accountable for that gain. A trustee cannot be permitted to profit through a breach of trust, even though the profit is not made at the expense of the trust estate. If a trustee makes a profit from an improper trust investment, the trust beneficiaries are entitled to that portion of the profit consisting of appreciation of misappropriated property *(Matter of Birnbaum v Birnbaum,* 157 AD2d 177). But where a trustee imprudently mingles his own (and perhaps another trustee's) funds in an investment that yields a profit, assuming the trust portion of the investment can be traced, the trustee should not have to disgorge his own share of those profits. In other words, any surcharge should be based on that portion of the investment identified as emanating from trust funds, rather than on the entire investment *(Provencher v Berman,* 699 F2d 568, 570-571; *Bird v Stein,* 258 F2d 168, 178, *cert denied* 359 US 926; Restatement of Restitution § 210 [2], and comments *b, d).*

The beneficiaries must, first of all, be able to point to some injury resulting from the improper diversion or commingling of trust assets *(Rogers v United States,* 697 F2d 886). The challenge is in apportioning the trustee's profits between those produced by his own legitimate efforts and those resulting from the use of commingled trust assets; where there has been

such a commingling the trustee normally bears the burden of identifying which property and profits should be treated as his own *(Leigh v Engle,* 727 F2d 113, 138). Rather than basing the surcharge on a return of the profits related to that portion (14%) of the investment emanating from the trust, the court, in its sweeping condemnation, surcharged the trustees for the entire profit of nearly $2.6 million, even though some of that profit was earned by an entity with which Goldstick had no connection. There is no authority for that approach. The surcharge should have been limited to that portion of the profits traceable to assets invested from the trust funds.

We therefore vacate this surcharge and, in light of the necessity for a remand on other matters, also remand this aspect of the case for what may amount simply to a recomputation of the appropriate surcharge in accordance with the foregoing, although the court would be free to permit further proof by the parties in the exercise of sound discretion.

(b) *Levine as the "passive" trustee.*

(i) *Regarding the real estate investments.* Levine did not participate in any of the real estate investments, nor was there any suggestion of self-dealing on her part. Indeed, the court specifically found that Goldstick had kept all the details and ramifications of his self-dealing ventures a secret from his cotrustee.

A trustee may delegate the exercise of a trust power to a fellow trustee, especially where the latter has an expertise in some particular aspect of the trust management *(see, Purdy v Lynch,* 145 NY 462); but that does not give a trustee the right to abdicate his duty to be personally "active in the administration of the trust" with regard to those functions which call for consistency with usually prudent business practice (Bogert, Trusts § 92, at 331 [6th ed]). In *Brown v Phelan* (223 App Div 393) we held that trustees cannot be automatically relieved of their responsibility for properly managing a trust with the excuse that their roles were merely "passive" in comparison to their more active cotrustee. Under such circumstances the burden would be on such trustees to demonstrate that their "inactivity" did not amount to negligence in allowing their fellow trustee to commit the defalcation. Although the rule may vary in other jurisdictions, a trustee in New York is held as much accountable for damage to the trust by reason of negligent inaction as for affirmative wrongdoing *(Matter of Howard,* 110 App Div 61, affd 185 NY 539), even where he had

no direct knowledge of the wrongdoing. Of course, liability will not be imputed to a passive trustee where even the exercise of prudent behavior would not have raised any suspicion as to the surreptitiously irresponsible acts of the active cotrustee *(Wilmerding v McKesson,* 103 NY 329; *Matter of Halstead,* 44 Misc 176, *affd sub nom. Matter of Halsted,* 110 App Div 909, *affd* 184 NY 563; *see also, Parker v Rogerson,* 33 AD2d 284, *appeal dismissed* 26 NY2d 964).* Nevertheless, the admonition of Lord Robertson, Lord President of the Scottish Court of Session, still resonates across nearly a century of development in this area of the law: "[I]f a man undertakes to act as trustee he must face the necessity of doing disagreeable things when they become necessary in order to keep the estate intact. A trustee is not entitled to purchase a quiet life at the expense of the estate" *(Millar's Trustees v Polson,* 34 Scot L Rep 798, 804).

■ We agree with the conclusion of the trial court that Levine shirked her fiduciary responsibility in deferring absolutely to Goldstick in the matter of his real estate investments. However, we disagree that she should have been surcharged in the same amount. There is ample precedent for differentiating between actively culpable and passively negligent trustees when it comes to fixing fiduciary surcharges. In *Matter of Rothko* (84 Misc 2d 830, *mod on other grounds* 56 AD2d 499, affd 43 NY2d 305), the trial court, although "constrained" to find all the fiduciaries liable, did draw such a distinction in imposing surcharges. Such "uneven treatment", in distinguishing between the deliberately malfeasant activities of two of the fiduciaries and the more subdued acquiescence of a third, was specifically approved by a majority of this court, as noted in the plurality opinion (56 AD2d, at 504). Thus, on remand of this surcharge the court shall consider whether the separate liability of Levine should therefore be further diminished below that of Goldstick by reason of her utterly passive status in relation to the real estate investments.

■ (ii) *Forfeiture of commissions as executrix ($86,318, plus interest of $67,031) and as trustee ($105,967).* We also disagree that Levine should have been ordered to forfeit all of her commissions because of her passivity. The forfeiture issue did not materialize until objectants' cross motion for such relief in response to Levine's motion for reargument of the accounting orders of July and August 1990. A fiduciary appointment, especially in a case as substantial as this one, is not simply an

honorific, with automatic entitlement to compensation. Commissions must be earned, the old-fashioned way. However, it appears to be uncontested on this appeal that almost 90% of the principal executorial commission paid to Levine (some $76,493) was received in her capacity as executrix between the time of Martin Tananbaum's death in 1970 and the settlement of the estate upon the giving of releases to Goldstick and Levine in 1977. As discussed in point (1) (a) *supra,* that sum is now beyond retrieval by the objectants. Only the balance of $9,825, plus interest, plus the trustee's commission of $105,967, should have been subject to forfeiture.

(4) *Co-op investment surcharge ($297,000, plus $253,000 in interest).* Tananbaum, residing in apartment 1NW at 1155 Park Avenue, was desirous of moving to a larger apartment (No. 10NW) which became vacant in about 1978. She testified that she "knew that the building was going to go co-op, and I wanted to buy both apartments" as an investment. Tananbaum sought counsel from Goldstick, who advised an alternative procedure, for two reasons. First, under the law she could not be offered two apartments as a primary residence in the same building on a co-op conversion. Second, as a practical matter, Tananbaum lacked the funds to purchase both apartments. The suggestion was made that a suitable substitute tenant might be found for apartment 1NW, and two mutual cousins were considered as possible candidates. It was believed that one of them, Alan Levine, would not be able to afford it, but Goldstick volunteered to subsidize Alan by "go[ing] into the deal with him." Tananbaum's understanding was that Goldstick would pay the rent for Alan, and eventually Alan and Goldstick would buy the apartment. She testified that she would prefer to have made the deal with Goldstick herself, but admitted that she never asked Goldstick to subsidize her and become her partner in such a venture. Ultimately, when the building did undergo co-op conversion, Tananbaum and Alan purchased their respective apartments, the latter in conjunction with Goldstick. Alan then "flipped" apartment 1NW, as planned, and made a profit of nearly $300,000, which he split with Goldstick. Casting a jealous eye at that handsome return, Tananbaum claimed at trial that Goldstick had usurped her opportunity for a profit of her own with respect to apartment 1NW, furthering in the process his own personal interests. On this appeal, her argument has centered more on Goldstick's alleged violation of fiduciary obligations in failing to exploit this asset as a trust opportunity.

■ The court surcharged the trustees for the full amount of the profit realized by Goldstick and Alan, which (with interest) amounted to $550,000, even though this claim was never pleaded by Tananbaum. This was hardly surprising. As even the court itself recognized, it was confronted not with an act of self-dealing by Goldstick with respect to a trust property, but rather an act of "self-dealing with respect to his client Minnie Tananbaum." Indeed, a commitment of trust funds for such a risky investment would have been highly suspect. Nevertheless, the court inappropriately granted relief to Tananbaum in this purely personal controversy over which it lacked subject matter jurisdiction *(Matter of Piccione*, 57 NY2d 278). The Surrogate's Court has no jurisdiction to hear independent claims involving controversies between living persons *(Solomon v Solomon*, 136 AD2d 697, 698).

If the relationship between Tananbaum and Goldstick in this regard was a purely personal one, the connection between Tananbaum and Levine was even more tenuous. Aside from the fact that Levine was the mother of the fortuitous tenant, Alan Levine, she owed no fiduciary duty to Tananbaum with respect to apartment 1NW. Accordingly, this surcharge should be vacated.

(5) *Funds, fees and expenses in connection with the sale of the Pound Ridge property and leasehold property at 983 Park Avenue ($56,396.26, plus $21,441.95 in interest, plus additional sums to be determined).* In 1980 Tananbaum used the proceeds from the sale of apartment 10NW to purchase a six-acre residential property on Trinity Pass in Pound Ridge, Westchester County, for $357,500. Experiencing what she termed "a cash flow problem," Tananbaum asked Goldstick for a loan of $200,000 from the testamentary trust, and then took his advice and conveyed the property to the trust (where it immediately became the largest valued item in that corpus), in order to place it beyond the reach of creditors. Tananbaum claims she thereafter made $300,000 worth of renovations on the property, but for all practical purposes the house lay vacant as she then took up residence in Europe. When Tananbaum defaulted on the mortgage, Goldstick came forward, on behalf of the trust, and rescued the property with a $320,000 payment in exchange for a satisfaction piece. The property was then placed on the market in 1982, for over a million dollars. Unable to attract a buyer at that price, the trustees petitioned the Surrogate's Court two years later for

permission to sell the property for $625,000. Tananbaum objected to this "undervaluation", and after two years of litigation over the issue, a sale was finally approved, in a rising market, for $910,000. These proceeds were held in escrow by the guardian ad litem for the benefit of the infant beneficiaries of the testamentary trust.

Several months after Tananbaum's sale of apartment 10NW, and shortly before execution of the transfer agreement on the Pound Ridge property, Tananbaum sought financing to lease another apartment at 983 Park Avenue, which she believed would soon undergo co-op conversion. At her request, Goldstick advanced her $100,000 from the trust as "key money", in exchange for a power of attorney which, Tananbaum claims, would allow Goldstick to sublet the apartment and purchase it, upon conversion, in Tananbaum's name, while she was off in Europe. According to Tananbaum, Goldstick misused the power of attorney to transfer the apartment into the name of the trust, which then acquired the $690,000 realized from the eventual sale of the converted apartment.

█ In the instant proceeding, Tananbaum objected to the charging of the trust for expenses in connection with the offer and eventual sale of the Pound Ridge property ($56,000), plus the legal fees in defending the trust against her unsuccessful effort to frustrate that sale (amount still to be determined). For the first time in any legal proceeding, Tananbaum raised an objection against the right of the trust to sell what she claimed was really her own property. The trial court agreed, surcharged the trustees individually for the expense charges plus interest (a total of about $78,000), and denied payment of legal fees from trust assets. In effect, the court ruled that the trustees had violated their fiduciary obligation when Goldstick gave Tananbaum "illegal" or "fraudulent" advice, and that Tananbaum should be held blameless and the trustees held individually liable for any costs flowing from her following such a course of action. We disagree.

In the first place, Goldstick was acting solely on behalf of the trusts; there is no claim that he derived any personal benefit. Second, the evidence simply does not support the trial court's ruling.

The proof offered by Goldstick was a written agreement in the form of a letter to the trustees, dated October 30, 1980, in which Tananbaum acknowledged that any trust funds advanced to her toward the purchase and renovation of the

Pound Ridge property was not a personal loan, but rather an "equity investment on behalf of the Trust," and that Tananbaum's only rights with regard to this property would be to reside therein on condition that she continue to pay mortgage, taxes and carrying charges. She specifically acknowledged that the deed remained in her name only to facilitate her ability to obtain mortgage financing: "This letter fully acknowledges that the Trust has all right, title and interest in the Trinity Pass house even though the deed is recorded in my personal name. The recording in my personal name was for the purposes of not accelarating *[sic]* the Chemical Bank mortgage. It is my understanding that the bank would not hold a mortgage on the real property that was owned by the Trust, they would only keep the mortgage on the property if it was in my name."

The agreement contained a similar provision with regard to the leasehold interest at 983 Park Avenue: "[T]he Trust will have all equity right in the stock and is, in fact, the owner of all right, title and interest in that co-op apartment irrespective of the fact that the co-op apartment is in my personal name. The reason for it being in my name will be that the Apartment Corporation will not allow a Trust to own the stock, but in any event, should anything happen to me the proceeds from the sale of this apartment or under any other circumstances should the apartment be sold, 100% of the proceeds are the property of the Will Trust."

A year later, on October 29, 1981, Tananbaum executed a deed formally conveying the Pound Ridge property to Levine and Goldstick in their capacity as trustees under the will of Martin Tananbaum. Not until 7½ years later, during the course of these proceedings, did she challenge for the first time the trustees' right to sell the property, which she now claimed was really her own. In the face of documentary evidence in the form of her explicit letter to the trustees in October 1980 and the Pound Ridge deed the following year, Tananbaum testified that the real understanding between the parties was that the conveyance agreement was merely for convenience, and that the property would always be recognized as hers, subject to return at her will when she could afford it. The trial court agreed with Tananbaum that the documents were a sham, designed solely for the purpose of defeating creditors, and were signed by her without benefit of independent counsel. Why else, Tananbaum asks, would

Goldstick have allowed a year to go by before formalizing the conveyance with a deed?

That argument cuts both ways. Tananbaum apparently knew perfectly well the purpose of the scheme. (After all, it was Tananbaum who was in financial straits, not Goldstick.) While Goldstick may have facilitated that scheme, Tananbaum's testimony indicates she was fully aware of what was being done for her benefit. Such unclean hands raise a serious question as to her entitlement to equitable relief *(Pattison v Pattison,* 301 NY 65). And if she had any misgivings about committing "fraud" or other "illegal" acts vis-à-vis her creditors, she certainly did not indicate such concerns when she executed the deed a year later. In fact, that instrument bore an explanation for the delay: "Minnie Lee Tananbaum had acquired the property as nominee for the trust. This conveyance is for the purpose of transferring the property from the nominee to the trust." In other words, the deed was merely a formal ratification of a year-old agreement between the parties.

Tananbaum's testimony flew in the face of not only the documentary evidence, but also her own pleadings in the 1984 litigation wherein she unsuccessfully sought to block the sale of the Pound Ridge property because of its alleged undervaluation. Fully four years after the conveyance, having had plenty of time to mull over the situation, Tananbaum was still adhering to the position—this time represented by separate counsel—that she had turned title to these properties over to the trustees simply as consideration for a right to occupy them during her lifetime. She even annexed a copy of the 1980 agreement to those pleadings.

The trustees' obligation was to the trust, and it cannot be gainsaid that their efforts to rescue the Pound Ridge property from foreclosure after Tananbaum had walked away from it, and their position in the 1984 litigation, were entirely legitimate, pursued in good faith, and ultimately vindicated by the granting of their petition. Under those circumstances, employment of counsel was a legitimate trust expense *(Matter of Stillman,* 107 Misc 2d 102, 113), notwithstanding the fact that a life tenant of the trust was the adversary in that proceeding.

(6) *Surcharge on the accounting fees, and denial of the right to charge additionally directed accounting expenses to the trusts.*

(a) *The surcharge ($167,446, plus $176,447 in interest).* The

trustees employed accountants for the six trusts who were paid more than $400,000 for their services over a period of years. There is no suggestion of any self-dealing by the trustees in this regard, or that the service relationship was anything less than at arm's length. Nevertheless, the court concluded that the fees "appear[ed] to be so excessive" as to constitute an abuse of fiduciary authority, and imposed on the trustees a surcharge of 60% of the fees paid.

In a decision after trial without jury, the Surrogate's Court is not required to list findings of fact or conclusions of law (SCPA 505 [2] [a]). The reason for this feature of Surrogate's Court procedure (cf., CPLR 4213 [b]), which dates from the early part of this century, was to avoid reversals in complex cases based upon technical errors in the findings. But this is not to say that pertinent findings and conclusions are prohibited; on the contrary, they are encouraged (see, 10 Cox-Arenson-Medina, NY Civ Prac—SCPA ¶ 505.02). The legislative intent was "to relieve the surrogate of the burden of defending and explaining his decision where the issues and facts are obvious and no explanation is required, and to lighten his judicial duties where such effort would serve no purpose. In practice, findings of fact and conclusions of law are generally made, the legal exemption notwithstanding." (Id., at 5-165.)

This was no mere technical error. Forcing the trustees to absorb 60% of the accounting fees deserved some explanation beyond the unsupported conclusion that the accountants charged accounting fees for performing menial and unnecessary bookkeeping tasks. On several occasions the Trial Judge frustrated attempts by the trustees to introduce evidence as to the nature and extent of the accounting services rendered. If the trial court is bent on such a drastic revision of the chargeable accounting fees, the least it should do is to furnish appropriate findings in support thereof. It is for this purpose that we remand this aspect of the case.

(b) *Personal absorption of additional accounting charges.* In a similar vein, we hold it unreasonable for the court to have ordered the trustees personally to bear the additional costs of engaging accountants for the purpose of bringing the trust accounts up to date, in compliance with an earlier court order. The will provided for the hiring of an accountant by the trustees, and normally such fees, if reasonable, can be charged to the estate or trust. The reasonableness of such charges against the trusts is always subject to judicial review. The

court's summary denial of that reimbursement was unjustified.

(7) *Surcharge on loan to Dorothy Tananbaum ($63,000, plus $45,808 in interest).* In 1982, with objectant DeGorge's approval, Goldstick authorized a $63,000 loan from the trust under the will for DeGorge's benefit, to the person objectants prefer to describe as "Goldstick's aunt" (who also, as it happens, is DeGorge's own mother!), for the purpose of enabling the latter to purchase an apartment. Surely the least palatable among the smorgasbord of claims advanced by these objectants, DeGorge now objects that the 17% interest on the note was never collected, and that the trustees negligently allowed the Statute of Limitations to expire. The court agreed, and surcharged the trustees $108,808.

 DeGorge does not deny that she urged the trustees to avoid litigation against her mother, but rationalizes that stance by suggesting she only adopted it when the Statute of Limitations had already expired. Apart from that unconvincing recollection, it is questionable whether noncollection of the loan has resulted in any loss, since the proprietary lease and the shares for the apartment are still being held as security by the trust, whose principal DeGorge will soon be receiving. DeGorge, who initially approved this loan to her mother, is now estopped from challenging it, and we vacate the surcharge.

(8) *Sale of White Devon Farm.* In their cross appeal, objectants challenge the trial court's dismissal of their claim for a surcharge on the allegedly undervalued sale in 1970 of White Devon Farm, a horsebreeding farm in upstate Geneseo. Because this property, a going business concern, demanded immediate attention at the time, its proper disposition was one of the first priorities of the trustees when they qualified as preliminary executors in 1970. The farm was sold that year for $1.4 million, including the auction of livestock for $100,000, after an unsuccessful testing of the market at $2 million. The sale was approved by the Surrogate's Court, after notice to and participation by all interested parties, including the guardian ad litem, who at that time represented the interests not only of the infant remaindermen, but also of DeGorge, who was then 20 years old. Twenty years later, without notice or pleading, objectants sought at this trial to have the trustees surcharged $4,115,620, the difference between the approved sale price in 1970 and what they now claim was the true value of the farm and its assets.

■ We entirely agree with the court's reasoning rejecting this claim on the merits. We would further note that in accordance with our analysis respecting the general releases delivered by objectants to the executors *(see,* point 1 [a], *supra),* this claim is wholly barred in any event. Even were we to consider the merits, we would note that the test for analyzing this judicially approved 1970 transaction would be whether the sale had been for less than fair market value *(Matter of Kane,* 98 AD2d 851, *lv denied* 61 NY2d 607). Absence of credible proof in that regard would be dispositive of this objection.

(9) *Attorney fees.* Objectants sought more than $900,000 in attorney fees from the trustees, supported by 62 pages of billing statements. When the trustees opposed, the objectants caused the issuance of a subpoena duces tecum for all of *Goldstick's* attorney's records, and the latter moved to quash. In December 1990 the court issued two rulings, the first denying Goldstick's motion to quash and upholding the subpoena, and the second granting objectants a partial protective order against Goldstick's discovery efforts to the extent that they sought, *inter alia,* oral deposition of the attorneys involved in the case.

■ ■ Since objectants concede that Goldstick's attorney's fees were not in issue, arguing merely that comparison with charges of Goldstick's attorney for items similar to those charged by objectants' attorneys would be of value in "confirm[ing]" that the latter were fair and reasonable, an insufficient showing was made for that relief *(see, Match v Match,* 168 AD2d 226). More to the point, our review of this record leads to the inevitable conclusion that objectants have failed to establish entitlement to any counsel fees at this time, and we so rule, *sua sponte.* Objectants sought approximately $15 million in surcharges and interest, of which some $4 million were denied by the trial court in connection with the sale of White Devon Farm. We have considerably reduced the balance to a low six figures, much of which is itself the subject of remand because of the insufficiency of objectants' proof. This does not bespeak entitlement to counsel fees. This is not to say that a substantial award to objectants on remand might not warrant reconsideration of the question of counsel fees; but for all legal services rendered thus far, attorney fees should be the respective responsibility of each side.

■ (10) *Removal of trustees.* While we disagree with the

imposition of much of the $11 million in surcharges and interest, we nevertheless agree that this bitter litigation has irreparably tainted the relationship between the trustees and the beneficiaries. Even Levine, who protests innocence of any misconduct and seeks to resign without the implication of censure that removal involves, concedes that her fiduciary service has been a bitter and frustrating experience. It is now time, as the Trial Judge held, for these trustees to make their final accountings and step aside in favor of successor trustees.

We have reviewed and considered all other issues raised on this appeal and cross appeal, and find them to be without merit. Accordingly, this consolidated cause is disposed of as follows:

(1) On Goldstick's appeal from an order entered May 21, 1990, denying his motion for the Trial Judge to disqualify herself, that order should be affirmed, without costs.

(2) (a) The appeal by Goldstick and Levine from most of a narrative order entered July 11, 1990, which ruled on 16 broad issues pertaining to objections to the trust accountings, should be dismissed without costs, all those portions of the order appealed from having been subsumed in the subsequent order of August 21, 1990.

(b) On objectants' cross appeal, so much of the narrative order of July 11, 1990 dealing with the sale of White Devon Farm, the disposition of the Pound Ridge property and certain legal fee applications should be affirmed, without costs. As to all other issues, the cross appeal should be dismissed without costs, those portions of the order having been subsumed in the subsequent order of August 21, 1990.

(3) On appeals by Goldstick and Levine, and cross appeal by objectants, from various rulings on 61 separate items in an "Interim Order on Surcharge", entered August 21, 1990, that order should be modified, on the law and the facts, as indicated herein, and otherwise affirmed, without costs.

(4) On appeal by Goldstick, the order of August 23, 1990, denying permission to engage accountants at additional trust expense, should be reversed, on the law, the facts and in the exercise of discretion, and leave should be granted for such engagement, subject, of course, to final review by the court, without costs.

(5) On appeal by Goldstick, the order entered December 5, 1990, denying his motion to quash the subpoena duces tecum for his attorney's time and expense records in conjunction

with the application to fix objectants' attorney fees, should be reversed, on the law, and the motion granted, without costs.

(6) Goldstick's appeal from the order entered December 28, 1990, granting protective orders to objectants on his discovery effort for further disclosure and depositions, aimed at objectants' request for counsel fees, should be dismissed without costs as academic, in light of our finding of nonentitlement to counsel fees for services rendered to date.

(7) (a) Levine's appeal from so much of an order entered on or about January 4, 1991, denying her reargument of the orders entered July 11 and August 21, 1990 *(supra)*, should be dismissed without costs, inasmuch as an order denying reargument is nonappealable.

(b) So much of the order entered on or about January 4, 1991 as granted objectants' cross motion for return of Levine's commissions should be modified, on the law and the facts, to the extent that the forfeiture of the executorial commission of $86,318 plus interest of $67,031 should be reduced to a forfeited principal sum of $9,825 plus interest to be determined by the Surrogate's Court on remand, and otherwise affirmed, without costs.

CARRO, J. P., MILONAS, ELLERIN and ROSS, JJ., concur.

Orders of the Surrogate's Court, New York County, entered on May 21, 1990, July 11, 1990, August 21, 1990, August 23, 1990, December 5, 1990, December 28, 1990, and January 24, 1991, are disposed of as follows:

(1) On Goldstick's appeal from an order entered May 21, 1990, denying his motion for the Trial Judge to disqualify herself, that order should be affirmed, without costs.

(2) (a) The appeal by Goldstick and Levine from most of a narrative order entered July 11, 1990, which ruled on 16 broad issues pertaining to objections to the trust accountings, should be dismissed without costs, all those portions of the order appealed from having been subsumed in the subsequent order of August 21, 1990.

(b) On objectants' cross appeal, so much of the narrative order of July 11, 1990 dealing with the sale of White Devon Farm, the disposition of the Pound Ridge property and certain legal fee applications should be affirmed, without costs. As to all other issues the cross appeal should be dismissed without costs, those portions of the order having been subsumed in the subsequent order of August 21, 1990.

(3) On appeals by Goldstick and Levine, and cross appeal by

objectants, from various rulings on 61 separate items in an "Interim Order on Surcharge", entered August 21, 1990, that order should be modified, on the law and the facts, as indicated herein, and otherwise affirmed, without costs.

(4) On appeal by Goldstick, the order of August 23, 1990, denying permission to engage accountants at additional trust expense, should be reversed, on the law, the facts and in the exercise of discretion, and leave should be granted for such engagement, subject, of course, to final review by the court, without costs.

(5) On appeal by Goldstick, the order entered December 5, 1990, denying his motion to quash the subpoena duces tecum for his attorney's time and expense records in conjunction with the application to fix objectants' attorney fees, should be reversed, on the law, and the motion granted, without costs.

(6) Goldstick's appeal from the order entered December 28, 1990, granting protective orders to objectants on his discovery effort for further disclosure and depositions, aimed at objectants' request for counsel fees, should be dismissed without costs as academic, in light of our finding of nonentitlement to counsel fees for services rendered to date.

(7) (a) Levine's appeal from so much of an order entered on or about January 4, 1991, denying her reargument of the orders entered July 11 and August 21, 1990 *(supra)*, should be dismissed without costs, inasmuch as an order denying reargument is nonappealable.

(b) So much of the order entered on or about January 4, 1991 as granted objectants' cross motion for return of Levine's commissions should be modified, on the law and the facts, to the extent that the forfeiture of the executorial commission of $86,318 plus interest of $67,031 should be reduced to a forfeited principal sum of $9,825 plus interest to be determined by the Surrogate's Court on remand, and otherwise affirmed, without costs.