OPINION OF THE COURT
Eve Preminger, S.
This is a petition to fix the legal fees of Edward Hayes (Hayes) and Francis Harvey, Jr. (Harvey), as lawyers for the executor in the administration of the estate of Andy Warhol.
Warhol died in February of 1987, leaving an estate of enormous diversity, complexity, and volatility. His death was unexpected and his business affairs were in disarray. His executor, Frederick Hughes (Hughes), had been Warhol’s close advisor and business partner for over 25 years. On the day Warhol died, Hughes made an unorthodox selection for counsel to the estate. He retained Hayes, an experienced criminal and civil litigator who had achieved what passes for New York celebrity as the model for a character in the best-selling novel "Bonfire of the Vanities”. Hayes had many clients and contacts in the entertainment industry and the media, but was not a trusts and estates lawyer. He retained Harvey, an experienced estate practitioner, to help with tax and accounting aspects of the administration of the estate. Harvey has *728 devoted his practice for some 25 years to estate planning and administration.[1]
The initial retainer agreement between Hayes and Hughes provided for a fee equal to 2Vi% of the gross estate, which Hughes then believed to be worth about $100,000,000. Within a few months the agreement was amended and the percentage reduced to 2%, due to "the fact that the estate is larger than originally thought.” The next and final amendment came over a year later, and fixed Hayes’ fee in an increased amount, equal to an executor’s commission.[2] Hughes stated the reason for this change as follows: "In the last six months, we have both gained a greater appreciation of the amount of work, time and effort that an estate of this size and complexity involves. For all intents and purposes, you have had to give up your law practice in order to properly advise the Estate. Although I have not required you to account for the hours spent on the Estate, I recognize that you are now devoting substantially all of your time to Estate matters. I have asked you to relocate your office * * * so that you can be on constant call for Estate activities and you have done so. You have had to retain a staff of other attorneys to be able to attend to the wide variety of legal questions that have arisen. Further, you have had to participate, under my direction, in a number of complicated matters in, for instance, publishing and licensing, to prudently increase the value of the Estate. The inventory and management of the assets is much more demanding than originally contemplated.”
The threshold issue in determining the amount of the legal fees is whether the retainer agreement between Hughes and Hayes is enforceable. There are of course substantial benefits to be garnered from the use of retainer agreements, including percentage fee agreements. They include the conservation of judicial and estate resources otherwise spent in determining the reasonableness of the requested fee and the exact amount of hours spent, and the inequities often resulting (usually to the estate) from a strict adherence to time charges. (Matter of Augar, 39 Misc 2d 936, affd 19 AD2d 861.) Fee agreements *729 also enable a fiduciary to estimate the amount of the legal fee at an early stage of estate administration.[3]
The court takes notice that percentage retainer agreements are commonly used in New York County estate practice. Indeed, the Appellate Division recently recognized that a fee award equal to 3% of the gross estate is "facially reasonable”. (Matter of Goldstick, 177 AD2d 225, 233 [1st Dept 1992], mod 183 AD2d 684; see also, Matter of Gates, 120 AD2d 890; see also, Matter of Kentana, 170 Misc 663.)
Despite the popularity of retainer agreements, they are not enforceable in the same manner as ordinary commercial contracts. (Matter of Lanyi, 147 AD2d 644; Matter of Krulish, 130 AD2d 959; Matter of Goldstein, 134 Misc 2d 57.) This does not mean, as the Foundation contends, that retainer agreements are irrelevant or to be ignored. It does impose a burden upon the attorney to establish that the terms of the agreement were fully and fairly presented to, and understood by, the client and that the agreement in its entirety is fair and reasonable. In determining reasonableness the court will consider the circumstances at the time of the agreement as well as the work actually performed by the attorney under the contract. (Matter of Schanzer, 7 AD2d 275, affd 8 NY2d 972; Matter of Lanyi, supra; Matter of Krulish, supra; Matter of Goldstein, supra; Matter of Bradley, 128 Misc 2d 240; Matter of Stecher, NYLJ, Aug. 7, 1991, at 26, col 6.) Where the attorney does not meet this burden, the fee will be based upon the reasonable value of the services rendered.
There is no question that Hughes understood the terms of the instant agreement. He was a sophisticated and experienced businessman who was accustomed to dealing with a variety of lawyers over the course of his career. He had a demonstrated ability to evaluate the quality of lawyers’ services and to replace them when dissatisfied. The history of the amendments to the agreement also indicates that Hughes knew exactly what was going on.
A more difficult issue is whether the basic payment term of the agreement — a fixed percentage without regard to the size of the estate — can be considered reasonable. A percentage fee agreement in a large estate is always problematic because of the possibility of a windfall to the attorney if the actual services are not commensurate with the percentage fee. (See, *730 e.g., Estate of Getty,[4] 143 Cal App 3d 455, 191 Cal Rptr 897; Brown, Some Observations on Legal Fees, 24 SW LJ 565 [1970].)
In the instant case, the initial retainer agreement might have been deemed reasonable if the circumstances, in terms of the size of the estate and the nature and amount of the services to be performed, had been as first envisioned. The first amendment, providing for a decrease in the fee percentage based on the emerging awareness of the size of the estate, might have been acceptable had it also provided for a continuing decrease in the fee percentage if the size of the estate further mushroomed. In any estate there comes a point where increase in size does not automatically increase the value of the legal services. There is no recognition of this elementary principle in the agreement. The court therefore concludes that the absence of a limiting or ceiling provision renders the amended retainer agreement unenforceable. Accordingly, the court will determine the reasonable value of the legal services performed.
What constitutes reasonable compensation requires consideration of the nature of the services rendered, the size of the estate, the responsibility undertaken, the difficulty of the legal issues, the ability of the attorney and the amount of time spent. (Matter of Potts, 213 App Div 59, affd 241 NY 593; Matter of Freeman, 34 NY2d 1.) All of these factors support the award of a substantial fee in this case.
Even though the Hughes-Hayes retainer agreement is not enforceable, it can serve as a guide for fixing reasonable compensation. (See, Matter of Tillman v Komar, 259 NY 133; Matter of Krooks, 257 NY 329; Matter of Goldstein, 134 Misc 2d 57; Matter of Scanlon, 2 Misc 2d 65.) Here, the agreement is of particular importance in establishing Hughes’ expecta *731 tian of Hayes and the time spent by Hayes on this estate. Hughes, who had been Warhol’s long-time business manager, was the sole executor. He knew the condition of the estate and that neither he nor anyone else could manage it alone.[5] Given the complexity of the assets and the responsibility to be assumed, Hughes asked Hayes to devote his entire practice to the Warhol estate. The record demonstrates that Hayes complied, giving up his growing legal practice at a time when it was reasonably expected to flourish.[6] The estate clearly benefitted from the joint commitment of Hughes and Hayes and from the fact that Hayes was available to Hughes on a "round the clock” basis,[7] was worrying about the problems of the estate to the exclusion of other issues, and could and did pay attention to estate matters as they arose without other major distractions. Hayes’ abandonment of his practice during this period, which necessitated that he later rebuild it, is an important factor in fixing his fee, because of both the detriment to him and the benefit to the estate.
The Foundation claims the fee should be limited because many of the services performed by Hayes were executorial, not legal, in nature. But the customary distinctions between executorial and legal services are of little meaning in this estate. Here, the executor decided, correctly, that he needed the advice of counsel from the moment of Warhol’s death. He called Hayes for legal assistance on the Sunday that Warhol died, and it appears that he sought his counsel on every step he took from then on. Hughes demanded Hayes’ constant presence and attention and forced him to give up other lucrative opportunities. Indeed, the record reveals that despite *732 the executor’s frequent hiring and firing of his personal lawyers, when it came to estate issues, he continued to rely on Hayes until he fired him as demanded by the eve of trial settlement agreement with the Foundation.
Furthermore, in an estate of this magnitude and complexity, it is difficult to categorize any activity or advice as executorial rather than legal. There were almost always legal ramifications to be considered and evaluated. The rules against paying legal fees for executorial services are designed to prevent the estate from being billed by the lawyer for what the executor has been paid commissions to do. They are not designed to frustrate an executor who, as here, needs the advice and participation of counsel and cannot perform his duties without it. All of this would be true regardless of whom Warhol had selected as executor; it is even more so in the case of Hughes who, though knowledgeable and experienced in the estate’s assets and activities, was limited in his ability to function due to a serious and rapidly declining medical condition.
In any event, the Court of Appeals has made it clear that legal services should be broadly construed and that a liberal rule should be applied where an executor has honestly sought and availed himself of the advice of counsel in matters connected with the handling and settlement of an estate. (Matter of Potts, supra; see also, Matter of Freeman, supra.)
The Foundation’s claim that Hayes did little to contribute to the success of this estate and rendered few legal services is contrary to the record. The Foundation’s own witnesses demonstrate that Hayes was involved in every aspect of the estate’s administration notwithstanding the fact that he did not perform all of the legal services alone. As contemplated by the fee agreement, the executor did retain specialists to handle certain issues but Hayes remained involved on a consulting and supervisory basis. Fees paid to those attorneys are another factor considered in fixing Hayes’ fee. (Matter of Mattis, 55 Misc 2d 511; Matter of Hanrahan, NYLJ, June 22, 1994, at 30, col 2.)
Warhol’s untimely death left his assets in turmoil. Immediate action was required to maintain continuity, and to preserve the assets and Warhol’s stature. It was crucial that the executor act in a way that would ensure Warhol’s viability as an artist and that he have an attorney at his side for continuing and immediate advice and discussion. Consideration also *733 had to be given to potential tax consequences from the sale and transfer of the assets. Each transaction had to be evaluated and reevaluated in terms of its potential for affecting Warhol’s status in the art market. Administering these assets could not be accomplished piecemeal. Rather, the executor had to consider the implications of each decision as it affected the over-all value of the estate and the value of other assets. In addition to many other services, Hayes provided such advice on a full-time basis.
The legal services for the Warhol estate covered a broad spectrum. The estate was comprised of a group of closely held, disparate businesses (including real estate partnerships and Interview magazine), Warhol’s creations (consisting of 75,000 pieces of art),[8] his personal art collection of 10,000 pieces, diaries, films, trademark and licensing rights and a stock and bond portfolio. Each asset required special and different attention. With respect to the art, every piece had to be authenticated, appraised, secured, insured and either sold or transferred to the Foundation. During the estate’s administration, sales of Warhol’s art totalled $32,000,000. Hayes, with Hughes, participated in successful negotiations with the Museum of Modern Art for a retrospective of Warhol’s art. This major exhibition was subsequently shown around the world and was critical to insuring Warhol’s status in the fickle and fluctuating art market. After extensive negotiations, Sotheby’s conducted a series of auctions of Warhol’s art collection resulting in sales of $25,000,000, far exceeding the $10,000,000 estimated. As a result of those negotiations the estate saved payment of commissions of approximately $2,500,000.[9]
Other contracts negotiated by Hayes were entered into to sell real estate (complicated by how the properties were held), the Warhol diaries (the estate realized over $1,000,000 in royalties), the right to exploit Warhol’s images, and collections of non-Warhol art. Warhol had two pension plans, one for himself and the other for his employees, which had to be terminated and benefits collected. The Foundation was formed and a museum devoted to Warhol was established in Pittsburgh. The creation of the Warhol Museum was structured to satisfy the Foundation’s obligation to pay out 5% of its assets *734 for nine years, thereby eliminating the need to sell art during that period. The complex negotiations with Eric Roper, Esq., counsel to the Dia Foundation, which led to the establishment of the Museum were conducted solely by Hayes. Investment decisions were continually made with respect to Warhol’s stock portfolio and those assets realized from sales. Federal and State estate and income tax returns were filed. The Internal Revenue Service conducted an audit over a two-year period. The audit concerned the value of gifts dating back to 1976 and administration expenses. The presently disputed legal fees were estimated to be between $8 and $12 million and approved by the IRS as a proper deduction, subject to the approval of this court.
Numerous claims were asserted against the estate, many of which were resolved without litigation. One important negotiation resulted in the avoidance of a will contest by Warhol’s brothers.[10] There were substantial claims of ownership of Warhol’s art[11] and real property, disputes over the pension fund, income tax issues, collection of insurance for art lost by the Museum of Modern Art (MOMA), customs duty claims for overseas assets, a claim by Bianca dagger in England and an issue concerning who owned the rights to Warhol’s diaries. Additionally there were many small disputes over commissions to freelancers and advertisers working for Interview. Finally, there was the preparation of a nonjudicial accounting.
Overall, the efforts of Hughes and Hayes were pivotal in securing Warhol’s stature and the estate’s assets throughout the administration of the estate. Unquestionably, the management of an estate of this magnitude and complexity was an immense task and the assumption of such responsibility entitles both the executor and his attorney to extraordinary fees commensurate with the services they rendered. As a result of their efforts, this estate not only survived but flourished in a turbulent market.
*735 Examination of the record of these proceedings, the oral and written testimony and exhibits thereto, the draft accounting filed by the executor, and a comparison to those few estates of comparable size, if not complexity, that have been administered in this court, compels the conclusion that petitioners and the executor they represented did a remarkable job in administering the Warhol estate. Reviewing the host of crucial and interlocking decisions with the benefit of hindsight, one can see how different the results might have been if any area had been neglected — if, for example, the exhaustive and difficult authentication task or the possibility of holding a MOMA retrospective had been ignored or delayed.[12] Not only were there no major mishaps, but the very real possibility that Warhol’s death and the need to sell some art would decrease his stature was averted.
Today, the assets of the estate have been collected, categorized and distributed. Warhol’s place in the art world is as secure as any artist of his time could be. It is in no small measure due to the foresight, determination and hard work of the executor and his lawyers. In awarding legal fees, it is often said that the largest determining factor should be the quality of the work and the results obtained. If we mean what we say, the Warhol fees should be on the high end of the scale.
For all of the foregoing reasons the court fixes the total fee for Hayes (and Harvey) payable from the estate in the amount of $7,200,000.
[Portions of opinion omitted for purposes of publication.]

. Hayes and Harvey have an internal agreement dividing the legal fees 75% to Hayes and 25% to Harvey.

. An executor’s commission is fixed by statute (SCPA 2307) and is calculated on a sliding scale (ranging from 5% to 2.5%) for the first $5,000,000 in estate assets and 2% for all amounts over $5,000,000.

. The court rejects Hayes’ suggestion that percentage fees are somehow necessary to motivate a lawyer to do a good job for a client.

. In Estate of Getty (supra), the California Attorney General challenged the statutory fee schedule as "absurd” where the estate exceeded $1 billion. The California Probate Code specifies executor commissions in regressive percentages for estates up to $500,000 and a rate of 1% for all above $500,000. As to attorney fees, California Probate Code § 910 (now § 10810 as amended) provides: "Attorneys for executors and administrators shall be allowed out of the estate, as fees for conducting the ordinary probate proceedings, the same amounts as are allowed by the previous article as commissions to executors and administrators; and such further amount as the court may deem just and reasonable for extraordinary services.” The court upheld the statute as applied, but the Legislature subsequently amended the statute to provide a "reasonable amount” for estates larger than $25,000,000.

. Warhol had over 40 employees working for his various business entities. Additionally, he retained attorneys on an ongoing basis to handle legal matters.

. The Foundation places undue emphasis on the fact that Hayes represented other clients during this five-year period. With a few exceptions those clients required limited assistance. At Hughes’ insistence Hayes declined to represent other important and potentially lucrative clients.

. The Foundation focuses on Hayes’ lack of time records as a reason for limiting the fee. The effect of an attorney not presenting time sheets is that the court need not accept the estimate of time expended. (Matter of Phelan, 173 AD2d 621; Matter of Schaich, 55 AD2d 914, lv denied 42 NY2d 802.) Here, there is ample proof that Hayes devoted the bulk of his time and legal practice to this estate. Although time is one of the less important criteria in fixing fees, it is one relevant factor and it is clear that Hayes did in fact spend several thousand hours working on this estate. (See, Matter of Shalman, 68 AD2d 940, appeal dismissed 48 NY2d 753; Matter of Brehm, 37 AD2d 95.)

. As discussed in this court’s prior decision on valuation, the marshal-ling and inventory of Warhol’s art was a monumental job. (Matter of Warhol, supra.)

. Marjorie Stone, Esq., counsel to Sotheby’s, testified that in 1988, when these auctions took place, its commission was 10%.

. A settlement was reached with Warhol’s brothers before they filed objections. Under that settlement, the executor assumed responsibility for paying estate taxes engendered by the brothers’ bequests under the will. An early settlement saved potential litigation expense and facilitated the distribution of the estate assets in a timely and tax effective manner.

. One action filed by the executor sought to recover six Warhol paintings from the estate of Alexander Iolas (Iolas). The Foundation contends that there was not very much in the way of legal work in that action. It is noted that in Iolas, the attorneys opposing Hayes billed several hundred thousand dollars for that action alone.

. Or even if security arrangements had not been implemented on the day of Warhol’s death. At that time there was an estimated $100 million of valuable objects in Warhol’s home, which more closely resembled a giant warehouse. There were persons seeking entry claiming ownership to items from that day forward. No losses were experienced until the Foundation loaned 45 drawings to MOMA for its 1989 retrospective. The drawings were never recovered.