**In re Edward W. HAYES, Debtor.**

**The Andy Warhol Foundation for Visual Arts, Inc., Plaintiff–Appellant,**

v.

**Edward W. Hayes, Defendant–Appellee.**

**No. 98–5023.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 13, 1998.

Decided July 30, 1999.

See also 637 N.Y.S.2d 708.

Thomas J. Schwarz, Skadden, Arps, Slate, Meagher & Flom LLP (Michael L. Cook, Neal Jacobson, of counsel), New York, New York, for Plaintiff–Appellant.

Laurence May, Angel & Frankel (Joshua J. Angel, of counsel), New York, New York, for Defendant–Appellee.

Before: WINTER, Chief Judge, MUKASEY,* District Judge, and RESTANI,** Judge.***

WINTER, Chief Judge:

The Andy Warhol Foundation for the Visual Arts, Inc. appeals from Judge Stein's affirmance of an order of the bankruptcy court dismissing the Foundation's nondischargeability complaint against Edward W. Hayes and concurrently denying its motion for summary judgment. The Foundation contended that Hayes's debt to it was governed by Bankruptcy Code ("Code") Section 523(a)(4), 11 U.S.C. § 523(a)(4), which provides, *inter alia,* that a debt arising from a "defalcation while acting in a fiduciary capacity" is nondischargeable. The bankruptcy court found that Hayes was not "acting in a fiduciary capacity" with respect to his debt to the Foundation, and the district court affirmed. We disagree and hold that Hayes's debt to appellant resulted from a defalcation while acting in a fiduciary capacity.

---

* The Honorable Michael B. Mukasey, of the United States District Court for the Southern District of New York, sitting by designation.

** The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

*** Pursuant to 28 U.S.C. § 46(b) and an order of the chief judge of this Court certifying a judicial emergency, this case was heard by a panel consisting of one judge from this court, one judge of the United States District Court sitting by designation and one judge of the United States Court of International Trade sitting by designation.

## BACKGROUND

■ The artist Andy Warhol died on February 22, 1987. Frederick W. Hughes, the executor of Warhol's estate, promptly retained Edward W. Hayes as counsel to the estate. Hayes's initial fee agreement, dated February 23, 1987, provided for a fee in the amount of 2.5% of the gross estate, measured as of the date of death. At the time, the estate was estimated to be worth about $100 million. Five weeks later, Hayes's fee agreement was amended to reduce his compensation to 2% of the gross estate to reflect the fact that the estate's value was significantly greater than initially thought. On June 25, 1987, Hayes was appointed General Counsel to the Foundation, the sole beneficiary of the estate. A year later, Hayes's fee agreement was amended yet again to pay to him an executor's commission, which is somewhat greater than the once-adjusted fee of 2%.[1] The second amended agreement, however, measured the value of assets in the estate as of the date of distribution.

Pursuant to the retainer agreement, Hayes received $4.85 million between 1987 and 1990. This was in excess of the roughly $2.5 million that he had initially expected to receive under contract, but, in light of the surrogate court's subsequent valuation of the estate at over $500 million, considerably less than the sum to which he was ostensibly entitled under the twice-amended retainer agreement. On April 24, 1992, alleging, *inter alia*, that "the Executor has refused to advance me portions of my attorney's fees for over two and one-half years," Hayes petitioned the New York Surrogate Court to determine the amount of his fees. He sought some $12 million pursuant to the fee agreement.

The surrogate court found Hayes's retainer agreement, as amended, unenforceable because it contained no ceiling or limiting provision. *See In re Estate of Warhol*, 165 Misc.2d 726, 629 N.Y.S.2d 621, 624

(Surr.Ct.1995). However, it then undertook an independent valuation of Hayes's services and concluded that they were worth $7.2 million, *see id.* at 627, based in part on its view that Hayes's services were not merely legal but akin to those of an executor, *see id.* at 625. Upon appeal, the Appellate Division reduced the valuation of Hayes's services to $3.5 million. *See In re Determination of Legal Fees Payable by Estate of Warhol*, 224 A.D.2d 235, 637 N.Y.S.2d 708, 709 (App.Div.1996) [*"Estate of Warhol"*]. It expressly disagreed with the surrogate court's analogy to executorial functions in setting the fee, *see id.* at 710 (noting that executorial services "may not properly be considered in the setting of the legal fee"), and further explained its reduction of the fee award by noting that "Hayes was not a specialist in the relevant field and . . . the award would compensate him at an exorbitant hourly rate," *id.* The effect of the Appellate Division's judgment was that Hayes now owed the estate $1.35 million of the $4.85 million he had previously been paid. The estate assigned this judgment to the Foundation on August 2, 1996.

On August 23, 1996, Hayes filed for bankruptcy. On December 9, 1996, the Foundation filed its complaint seeking to have Hayes's obligation to it declared nondischargeable under Code Section 523(a)(4). Hayes moved to dismiss the complaint, and the Foundation cross-moved for summary judgment. The bankruptcy court granted Hayes's motion to dismiss and denied the Foundation's cross-motion for summary judgment. The court found that there was no "express or technical trust established between Debtor and the Foundation" and thus that Hayes was not "acting in a fiduciary capacity at the time he incurred his $1.35 million deficit to the Foundation." *In re Hayes*, No. 96 B. 44536, at 12, 17 (Bankr.S.D.N.Y. Apr. 16, 1997) (transcript of hearing). The district

---

1. An executor's commission is fixed by statute and is calculated on a sliding scale (ranging from 2.5% to 5% for the first $5 million and

2% for all amounts over $5 million). *See* N.Y. Surr. Ct. Proc. Act § 2307(1) (McKinney 1996).

court affirmed on substantially the same reasoning, holding that Hayes was not "a trustee of an 'express' or 'technical' trust," in part because "the bankruptcy court found that Hayes had not received 'advance pay for future services,' but instead 'received legal fees as approved by the surrogate's court for services rendered.'" *See In re Hayes,* 97 Civ. 4240, at 3–5 (Mar. 11, 1998) (Opinion and Order) [*"Hayes I "*]. The Foundation then moved for reconsideration of the district court's opinion on the ground that it had incorrectly applied a deferential standard of review to the bankruptcy court's findings of fact. The Foundation's motion was granted, but the district court, applying *de novo* review, again affirmed. *See In re Hayes,* 97 Civ. 4240, at 3 (Apr. 13, 1998) (Order) [*"Hayes II "*]. The Foundation then brought the present appeal.

## DISCUSSION

The record is somewhat ambiguous as to whether the bankruptcy court dismissed the Foundation's complaint under Bankruptcy Rule 7012 or 7056. *See In re Hayes,* No. 96 B. 44536, at 17 (claim "dismissed for failing to state a cause of action upon which relief may be granted"); *Hayes II,* at 1 ("The bankruptcy court ... dismissed the Foundation's complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 56 ...."); *see also Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75–76 (2d Cir.1998) (court may convert motion to dismiss to one for summary judgment); *Morelli v. Cedel,* 141 F.3d 39, 45 (2d Cir. 1998) ("Consideration of matters outside the pleadings converts the defendant's motion to dismiss into a summary judgment motion."). Because the bankruptcy court's decision was made in the context of a ruling on the Foundation's motion for summary judgment and the court took note of the parties' submissions, we construe the court's decision as a grant of summary judgment under Bankruptcy Rule 7056. Summary judgment is appropriate only if the pleadings and submissions, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995).

Code Section 523 provides in pertinent part that "[a] discharge ... does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (hereinafter, the "defalcation exception"). The Foundation's contention is that the attorney-client relationship is a fiduciary one and that Hayes's failure to repay unearned funds paid to him under an unenforceable fee agreement constitutes a "defalcation" within the meaning of Section 523. The bankruptcy and district courts disagreed. Using very similar reasoning, these courts held that "a debtor acts in a fiduciary capacity only as trustee of an 'express' or 'technical' trust, not as trustee of a constructive or implied trust imposed as a matter of equity." *Hayes I,* at 2 (citing, *inter alia, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)). Thus, "[o]nly where the attorney in such a relationship is required ... to hold property in an 'express or technical trust' does the requisite fiduciary relationship exist for purposes of section 523(a)(4)." *Id.* at 3.

■ Although the precise scope of the defalcation exception is a question of federal law, its application frequently turns upon obligations attendant to relationships governed by state law. For example, state law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4). *See, e.g., In re Black,* 787 F.2d 503, 506 (10th Cir.1986), *abrogated on other grounds by Grogan v. Garner,* 498 U.S. 279, 283 n. 7, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982). On the other hand, there are federal limits on the ability of state law to expand the effects of this provision. *See, e.g., In re Marchiando,* 13

F.3d 1111, 1116 (7th Cir.1994) ("If ... a fiduciary is anyone whom a state calls a fiduciary ... states will have it in their power to deny a fresh start to their debtors by declaring all contractual relations fiduciary."). As a general matter, therefore, federal law sets the outer boundaries of the defalcation exception, while state law may, through lesser or greater regulation of fiduciary obligations, affect the application of the provision.

■ At the outset, we acknowledge that competing institutional policies frame the issue. Bankruptcy is both a debtor's right and a creditor's remedy. As the district court noted, " 'one of the primary purposes of the bankruptcy act is to ... permit [the honest debtor] to start afresh,' " *Hayes I*, at 2 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)) (alteration in original), a policy that is implemented through the discharge of antecedent debts. For this reason, exceptions to discharge are construed narrowly. *See Black*, 787 F.2d at 505. Nevertheless, the fresh-start policy does not apply to all debts and debtors, and there are numerous Code provisions setting forth limitations on discharge. *See, e.g.,* 11 U.S.C. § 523 (exceptions to discharge). Some of the exceptions to discharge are evidently intended to deny relief to debts resulting from certain types of undesirable behavior. *See id.* § 523(a)(2) & (a)(4) (debts resulting from fraud or material misstatements by the debtor), (a)(3) & (a)(10) (debts not listed on current or past bankruptcy disclosure statements), (a)(6) & (a)(9) (debts resulting from intentional torts or as a result of driving while intoxicated). Other exceptions, however, simply reflect perceived countervailing social interests in particular kinds of debt. *See id.* § 523(a)(5) (spousal and child support payments), (a)(1) & (a)(8) (certain debts owed to governmental entities), (a)(4) (certain breaches of fiduciary duty).

### a) *Fiduciary Capacity*

While the Code does not clarify the meaning of the term "fiduciary capacity" as used in Section 523(a)(4), counterparts of this provision have existed at least since Section 1 of the Bankruptcy Act of 1841, which excepted from discharge "debts ... created in consequences of a defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity." Ch. IX, § 1, 5 Stat. 441 (1841) (repealed 1843). *See generally In re Turner*, 134 B.R. 646 (Bankr.N.D.Okla.1991). The common link among the specific positions listed is that they involve "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter." *Marchiando*, 13 F.3d at 1116 (citation omitted); *see also* Note, *An Analysis of the* Matter of Bennett *and Its Effect on Non–Dischargeability of Debt for Defalcation While Acting in a Fiduciary Capacity*, 46 Baylor L.Rev. 281, 285–86 (1994).

■ It has been clear, at least since 1841, that the defalcation exception is not limited to express trusts, *i.e.,* situations where a trustee is a beneficial owner of a *res* held and managed for a named beneficiary. Indeed, the act stated as much in specifying "executor[s], administrator[s], guardian[s] or trustee[s]" and then adding others "acting in any other fiduciary capacity." Moreover, Section 4 of the same act provided that "no person should be entitled to a discharge who should 'apply trust funds to his own use.' " *Hennequin v. Clews*, 111 U.S. 676, 679, 4 S.Ct. 576, 28 L.Ed. 565 (1884) (quoting ch. IX, § 4, 5 Stat. 441). This heightened restriction, which applied to the person rather than the particular debt, indicates that Section 1 applied to a greater range of persons and debts than trustees and misappropriation of trust funds, because that Section would otherwise have been superfluous.

The limitations on discharge in the Bankruptcy Act of 1841 were notable because that Act shifted the emphasis of

bankruptcy law from that of creditors' remedy to debtors' protection. *See* Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge,* 65 Am. Bankr.L.J. 325, 349–50 (1991). Although the precise language of the defalcation exception has changed slightly in each major revision of the bankruptcy code,[2] there is wide agreement that its meaning has not. *See, e.g., Turner,* 134 B.R. at 655 ("Legislative history indicates no intent to change prior law....."); Charles Jordan Tabb, *The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate,* 59 Geo. Wash. L.Rev. 56, 73–74 (1990) (noting failed legislative efforts to reduce exceptions to discharge).

 Of course, the attorney-client relationship entails one of the highest fiduciary duties imposed by law. *See, e.g., In re Cooperman,* 83 N.Y.2d 465, 472, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994) ("This unique fiduciary reliance ... is imbued with ultimate trust and confidence."). In *Cooperman,* the New York Court of Appeals explained that "[t]he duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's." *Id.* at 472, 633 N.E.2d 1069.

As a result, the attorney-client relationship, although usually not involving a technical trustee or express trust, has long been understood to be a fiduciary relationship within the meaning of the defalcation exception. *See, e.g., In re Young,* 91 F.3d 1367, 1372 (10th Cir.1996) ("[C]ourts have often found the requisite trust relationship to be created by the applicable Rules of Professional Responsibility."); *Marchiando,* 13 F.3d at 1115 ("[A] lawyer is deemed the fiduciary of his client [under Section 523], even if he does not manage a fund entrusted to him by the client...."); *In re Gelson,* 12 F.Supp. 924, 925 (E.D.N.Y. 1935) ("An attorney receiving money which is the property of his client, does so in a fiduciary capacity, within the purview of the bankruptcy law.").[3] Moreover, numerous cases have applied the defalcation exception to debts owed by corporate officers, notwithstanding the absence of any express trust. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are in trust." (citations omitted)); *In re Hammond,* 98 F.2d 703, 705 (2d Cir.1938) ("It can scarcely be doubted ... that a director [is a fiduciary]."); *In re Bernard,* 87 F.2d 705, 707 (2d Cir.1937) (holding that directors and officers are fiduciaries).

The district court's view that only the trustee of an express or technical trust

---

**2.** Section 33 of the Bankruptcy Act of 1867 excepted from discharge "[any] debt created by the fraud or embezzlement of the bankrupt, by his defalcation as a public officer, or while acting in any fiduciary character." Ch. 176, § 33, 14 Stat. 533 (repealed 1878). Section 17(a)(4) of the Bankruptcy Act of 1898 excepted from discharge any debts "created by ... fraud, embezzlement, misappropriation, or defalcation while acting as an officer, or in any fiduciary capacity." Ch. 541, § 17, 30 Stat. 544, 550–51 (repealed 1978).

**3.** *See also In re Barton,* 465 F.Supp. 918, 923 (S.D.N.Y.1979) ("The cases under section 17(a)(4) [of the Bankruptcy Act of 1898] regarding attorneys as fiduciaries are united in their prohibition of attorney conduct that affects funds or other property [e]ntrusted to

the attorney, under a retained claim of equitable title by the client."); *In re Schulman,* 196 B.R. 688, 698 (Bankr.S.D.N.Y.1996) (noting that debtor-attorney's conversion of client's money is fiduciary fraud (citing *In re Kane,* 48 F.2d 96 (2d Cir.1931))); *In re McDowell,* 162 B.R. 136, 139 (Bankr.N.D.Ohio 1993) (holding that an attorney is a fiduciary under Section 523(a)(4)); *Kwiat v. Doucette,* 81 B.R. 184, 188–89 (D.Mass.1987) (taking a narrow view of Section 523, but still finding that an attorney holds a fiduciary capacity to his client); *In re Janikowski,* 60 B.R. 784, 789 (Bankr.N.D.Ill.1986) (concluding that "the fiduciary relationship created between an attorney and client under Illinois law meets the requirements for a fiduciary relationship under [Section] 523(a)(4)").

acts in a fiduciary capacity for the purposes of the defalcation exception is based on a line of cases dating to *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), the first Supreme Court case to interpret the defalcation exception. In *Chapman,* the Court held that factors, agents who sell merchandise on consignment, were not fiduciaries for the purposes of this provision. The Court noted that the enumerated exceptions, *e.g.,* executors and guardians, "are not cases of implied but special trusts, and the 'other fiduciary capacity' mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act." *Id.* at 208. An alternate construction, the Court noted, "would have left but few debts on which the law could operate," because "[i]f the act embrace such a debt, it will be difficult to limit its application." *Id.* Notably, the Court in *Chapman* spoke of "special trusts" not in the modern sense of a legal relationship where a party (the trustee) is the legal owner of property beneficially held on behalf of others, but more generally of the class of relationships in which special trust is bestowed upon a party.

Ninety years later, the Court revisited this issue. In *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), it reaffirmed *Chapman*'s holding that "a factor does not act in a fiduciary capacity." *Id.* at 333, 55 S.Ct. 151 (citing *Chapman,* 43 U.S. at 208). *Davis* involved an action in trover against an automobile dealer by one of its creditors. The dealer had financed his inventory pursuant to a standard "floor-planning" arrangement, whereby the dealer would provide to the creditor a trust receipt promising to hold the vehicle on behalf of the creditor until sold and to repay the creditor immediately out of the proceeds of the sale. The dealer had obtained a discharge in bankruptcy, which he then raised as a defense to the creditor's claim. The trial held that the debt was within one of the enumerated exceptions to dis-

charge in the Bankruptcy Act of 1898, and the Illinois appellate court affirmed. *See id.* at 331, 55 S.Ct. 151. The Supreme Court reversed. Justice Cardozo, writing for the Court, quoted *Chapman*'s language that "the statute 'speaks of technical trusts, and not those which the law implies from the contract.'" *Id.* at 333, 55 S.Ct. 151 (quoting *Chapman,* 43 U.S. at 208). His concern was the same as that expressed in *Chapman*—that the act not be construed so as to except from discharge normal commercial debts. To this end, he explained:

> It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.... "The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created."

*Id.* (quoting *Upshur v. Briscoe,* 138 U.S. 365, 378, 11 S.Ct. 313, 34 L.Ed. 931 (1891)).

■■■ However, neither *Chapman* nor *Davis* casts serious doubt on the fact that certain relationships not constituting actual trusts are within the defalcation exception. The focus of those decisions, rather, was on preventing the extension of the exception to ordinary commercial debts. *See Hennequin,* 111 U.S. at 682, 4 S.Ct. 576. The district court's second premise was that even if the attorney-client relationship is of a fiduciary nature for purposes of Section 523(a)(4), Hayes was not a fiduciary of his client with respect to the disputed fees. In our view, this analysis confuses the issues of fiduciary capacity and defalcation. The fiduciary obligation owed by an attorney to his client extends to all aspects of the attorney-client relationship, including the means by which the relationship is created, as evident from the extensive regulation of attorney-client fee arrangements. *See, e.g.,* N.Y.Code of Prof'l Resp. DR 2–106 (fee for legal ser-

vices) & DR 2–110 (withdrawal from employment); *see also Cooperman,* 83 N.Y.2d at 472, 611 N.Y.S.2d 465, 633 N.E.2d 1069 ("[A]ttorney-client fee agreements are a matter of special concern to the courts and are enforceable and affected by lofty principles different from those applicable to commonplace commercial contracts."); *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985) ("An attorney has the burden of showing that a fee contract is fair, reasonable, and fully known and understood by the client."); Lester Brickman & Lawrence A. Cunningham, *Nonrefundable Retainers Revisited,* 72 N.C. L.Rev. 1, 29 (1993) ("As a fiduciary for his client . . ., a lawyer—in fee arrangements and otherwise—is held to a 'fairness-in-fact' standard. . . ."). Moreover, disaggregating the fiduciary relation into component pieces for purpose of this analysis is, we think, unwarranted. Otherwise, the existence and scope of an attorney's fiduciary obligation, as distinct from the question of defalcation, would turn on an *ex post* analysis of whether the fees in any particular instance were to be held in trust—just the sort of reasoning the Court rejected in *Davis* in refusing to interpret "fiduciary capacity" to reach constructive trusts arising out of ordinary commercial relationships. *See Davis,* 293 U.S. at 333, 55 S.Ct. 151. The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been made. *See id.* at 333, 55 S.Ct. 151; *Turner,* 134 B.R. at 648.

We recognize that several courts have utilized reasoning similar to that employed by the district court in holding dischargeable debts owed to clients by attorneys. In particular, courts have sought to justify the discharge of debts resulting from attorneys' commercial dealings with clients, *see, e.g., In re Garver,* 116 F.3d 176, 178–

79 (6th Cir.1997) (discharging debt arising from business deal between attorney and client); *Young,* 91 F.3d at 1372–74 (same); *Barton,* 465 F.Supp. at 924 (same), and those resulting from adverse malpractice judgments, *see, e.g., In re Mason,* 191 B.R. 50, 54–55 (Bankr.S.D.N.Y.1996); *In re Stokes,* 142 B.R. 908, 910–11 (Bankr. N.D.Cal.1992). Some of these have cited the "technical trust" language of *Davis. See, e.g., Garver,* 116 F.3d at 179–80; *Young,* 91 F.3d at 1371–72; *Mason,* 191 B.R. at 54–55; *Stokes,* 142 B.R. at 909–10.

■ A possible explanation for these cases might be that the debts involved either did not arise within the scope of the attorney-client relationship, *see Barton,* 465 F.Supp. at 923–24, or, for reasons discussed below, did not involve a "defalcation." [4] This view is supported in part by other cases holding attorneys' commercial debts nondischargeable when the commercial relationship is too intertwined with the legal one. *See, e.g., In re Cochrane,* 124 F.3d 978, 984 (8th Cir.1997) (attorney self-dealing in business deal with clients); *In re Charfoos,* 183 B.R. 131, 136–37 (Bankr. E.D.Mich.1994) (attorney used influence with client to gain loan).

■ Nevertheless, the reasoning of the opinions in cases such as *Garver,* even if not required by the facts, rejects the view that the attorney-client relationship is of a fiduciary nature for purposes of Section 523(a)(4). We respectfully disagree with that reasoning. Instead, we follow the Eighth Circuit in holding that the attorney-client relationship, without more, constitutes a fiduciary relationship within the meaning of Section 523(a)(4). *See Cochrane,* 124 F.3d at 984; *see also Marchiando,* 13 F.3d at 1115 (stating, in dictum, that attorney-client relationship is fiduciary relationship under Section 523(a)(4)). Further, for the reasons stated

---

4. As discussed below, the term defalcation implies a shortcoming as to funds for which one must account. An attorney who fails to fulfill a malpractice judgment has not committed a defalcation because the attorney, although a fiduciary of and indebted to the client, did not come up short as to any *funds* for which he had an obligation to account antecedent to the wrong.

above, we hold that the attorney's fiduciary obligation extends to matters involving fee agreements. We therefore turn to the question of whether the debt was the result of a defalcation.

b) *Defalcation*

As noted, the term defalcation has appeared in every bankruptcy act since 1841. Despite its longstanding use, however, its precise meaning remains unclear. *See In re Twitchell,* 72 B.R. 431, 434 (Bankr. D.Utah 1987) ("The term 'defalcation' ... does not have a precise definition and no legislative history or comment exists to aid the interpretation."), *rev'd,* 91 B.R. 961 (D.Utah 1988), *rev'd,* 892 F.2d 86 (10th Cir.1989) (table).

The first significant effort to define the term was undertaken by Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511–12 (2d Cir.1937). Herbst was a dentist who had been appointed receiver of a parcel of land in a foreclosure suit. He received $42,000 in allowances and, when the property was sold, asked for and was granted by the court an additional $5,674.54, which he promptly spent. Upon appeal, the allowance was denied, and the Court of Appeals of New York held that Herbst's surety must pay the deficiency judgment against him. The surety's subrogation action against Herbst was then brought in federal court.

Judge Hand's opinion held that the shortcoming constituted a defalcation. He noted that "[c]olloquially perhaps the word, 'defalcation,' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. It must be remembered that the 'fiduciary capacity' was limited to 'special' or 'technical' fiduciaries." *Id.* at 511 (citing *Chapman,* 43 U.S. at 208). In the court's view, the case did not involve wholly innocent conduct. Herbst had committed a defalcation because:

A judge had awarded him the money ... but he knew, or if he did not know, he was charged with notice ... that the order would not protect him if it were reversed; and that it might be reversed until the time to appeal had expired. He made no effort to learn from the plaintiff whether it meant to appeal, and he did not wait until it could no longer do so; he took his chances. We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; in *[In] re Bernard,* 87 F.2d 705, 707 [ (2d Cir.1937) ], we said that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake." Although that word [misappropriation] probably carries a larger implication of misconduct than "defalcation," "defalcation," may demand some portion of misconduct; we will assume arguendo that it does.

All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation."

*Id.* at 512.

Judge Hand's discussion remains the most authoritative explication of the measure of the term. *See Turner,* 134 B.R. at 658 (collecting cases). Nevertheless, courts have articulated different views of the type of conduct that may constitute a defalcation. *See Twitchell,* 72 B.R. at 434–36 (surveying issue). Perhaps because of the reference in *Herbst* to "innocent defaults," some cases have construed the definition of defalcation extremely broadly. *See, e.g., In re Gans,* 75 B.R. 474, 490–91 (Bankr.S.D.N.Y.1987) ("Where a debtor-attorney is found to have breached the fiduciary duty to the client, any debt arising within the fiduciary relationship may be nondischargeable pursuant to Section 523(a)(4)."). This view may well explain the above-noted cases parsing the defini-

tion and scope of "fiduciary capacity" for the purposes of Section 523(a)(4). Other cases have construed the term narrowly to require some sort of "moral dereliction." *See, e.g., Turner,* 134 B.R. at 657–59. The authorities are divided on the extent of misconduct, if any, that is required. *See In re Ellenbogen,* 218 B.R. 709, 716–18 (Bankr.S.D.N.Y.1998).

The present case is distinguishable from *Herbst* in at least one important respect. Herbst received money as allowances from an actual trust account in his direct control for which he had a strict duty to account under the law of trusts. Hayes, by contrast, received his money as fees paid by the executor from an account controlled by the executor. Although we have rejected this distinction as grounds for holding that Hayes was not acting as a fiduciary, we believe it is relevant to the question of whether Hayes's debt constitutes a defalcation. Control of a trust account by a fiduciary involves an array of responsibilities and possible missteps that differ in many ways from the responsibilities regarding fees by one hired to perform specialized, professional services in a fiduciary capacity. In the former situation, liability is stricter than in the latter, and any shortage may, as Judge Hand suggested, raise colorable issues as to dischargeability under Section 523(a)(4), particularly where the fiduciary is the payee. In the latter case, fees are not accounts held for others but rather payments that presumptively belong to the recipient. For this reason, any *ex ante* duty on Hayes's part to account for such fees must be based upon a violation of his fiduciary duty and resultant unreasonableness of his claim of right or title to such funds.

■ The term defalcation may well not fit comfortably when used in the context of a dispute over the value of legal services, at least where no bad faith or other breach of fiduciary duty is shown. A lawyer or other fiduciary is allowed to act in his or her self-interest in charging for services in good faith. It is therefore arguable that,

where the need for particular services or the size of a fee is a close one and bad faith is not shown, a dispute that is resolved against the fiduciary provider of services does not give rise to a debt non-dischargeable under Section 523(a)(4). If a lawyer for an estate is paid by an executor with a duty of his or her own not to overpay, a court's subsequent disagreement as to value of services might not automatically lead to the conclusion that the resultant debt constituted a "defalcation," even under Judge Hand's broad view of that term. However, we need not decide that issue given the facts of the instant matter because even assuming, as did Judge Hand, that defalcation demands "some portion of misconduct," we hold that Hayes committed a defalcation.

■ Although Hayes understandably casts the record as showing only a disagreement regarding the size of retainers and the value of services rendered, the record reveals a somewhat different disagreement. Hayes' fee was paid pursuant to an *ex ante* invalid fee agreement that matched fees, not to value of services or even to the value of an estate with assets of stable value, but to a rising art market that had nothing to do with the services he was to perform. *See Estate of Warhol,* 637 N.Y.S.2d at 710 ("[T]he [fee] award would compensate [Hayes] at an exhorbitant hourly rate."); *Estate of Warhol,* 629 N.Y.S.2d at 623 ("Where the attorney does not [establish the entire fairness and reasonableness of the agreement], the fee will be based upon the reasonable value of the services rendered."); *see also Cooperman,* 83 N.Y.2d at 473, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (linking compensation for discharged attorneys to "the fair and reasonable value of the completed services"). Because the value of his services was irrelevant to the fees he sought, there was no cap on fees, and he expected the periodic payments to be made without regard to the value of past or future services. Indeed, the actual value of his services became relevant only after he filed a petition

seeking $12 million pursuant to the agreement and the agreement was held invalid.

To be sure, it appears that Hayes made a substantial contribution to the estate and the Foundation at great sacrifice to himself. *See Estate of Warhol,* 629 N.Y.S.2d at 624–27. Indeed, Hayes devoted his entire practice to the estate, "giving up his growing legal practice at a time when it was reasonably expected to flourish." *Id.* at 624. Nevertheless, Hayes's conduct was inconsistent with his obligation to deal fairly, albeit at a profit to himself, with the estate in establishing a fee arrangement because there was no attempt to match fees and the value of services—even to the extent of imposing a cap on the fees—as required by New York law. *See id.* at 623. Instead, fees were matched to the art market. Nor, for that matter, were the payments made retainers to pay for future services in which adjustments could be made as the actual services were performed. Rather, the payments were pursuant to the invalid fee agreement. Moreover, having arranged a fee agreement that did not match payments to value of services, Hayes chose not to limit his spending to a conservative estimate of what a court might eventually approve or to seek pre-approval of that questionable agreement in New York courts. *See* N.Y. Surr. Ct. Proc. Act § 2110(1) (McKinney 1996) ("At any time during the administration of an estate ..., the court is authorized to fix and determine the compensation of an attorney for services rendered ...."); *id.* § 2110(3) ("In any event that any such attorney has already received or been paid an amount in excess of the fair value of his services as thus determined the court is authorized to direct him to refund the excess.").

On the facts and circumstances presented, we therefore conclude that Hayes's conduct was sufficiently at odds with his fiduciary obligations to constitute a defalcation within the meaning of Section 523(a)(4) and the gloss put upon it by *Herbst.* In doing so, we do not reach the question of the dischargeability of debts incurred by attorneys as a result of payments determined *ex post* by a court to be excessive where a good faith attempt was made to match fees and the value of services, or where no ready avenue to seek approval in advance exists.

We therefore reverse and order entry of judgment for the Foundation.